**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DJENE TRAORE,                          *
                                       *
Plaintiff                              *
                                       *
v.                                     *          Civil Action No. MJM-22-793
                                       *
BALTIMORE POLICE DEPARTMENT, *et al.*,*
                                       *
Defendants                             *

\* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Djene Traore commenced this civil action against Baltimore Police Department ("BPD") and Commissioner Michael Harrison, Robert Quick, Jasmine Riggins-Green, and Amy Guervara (collectively, "Individual Defendants"), in their individual and official capacities, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; and 42 U.S.C. §§ 1981, 1983, and 1985; as well as malicious prosecution, malicious use of process, and abuse of process under Maryland law. Currently pending is Defendants' Motion to Dismiss the Second Amended Complaint or In the Alternative for Summary Judgment (ECF 40, the "Motion"), which incorporates arguments made in support of an earlier filed motion to dismiss the prior Amended Complaint. The Motion is fully briefed. The Court has reviewed the filings and finds that no hearing is necessary. L.R. 105.6. For the reasons stated below, Defendants' Motion will be GRANTED.

## I.        BACKGROUND

### A.  Procedural Background

Plaintiff filed the Amended Complaint in this matter (ECF 18) after Defendants moved to dismiss the original Complaint. On October 18, 2022, Defendants filed a motion to dismiss or, in

the alternative, for summary judgment (ECF 21), attaching a memorandum of law in support of the motion (ECF 21-1) and several exhibits (ECF 21-3 to 21-5). Plaintiff filed a response in opposition to the motion (ECF 28) and a declaration pursuant to Fed. R. Civ. P. 56(d) (ECF 29). Defendants filed a reply (ECF 30). Plaintiff subsequently filed a motion for leave to file a Second Amended Complaint (ECF 31), which the Court granted. The Court's Order (ECF 38) denied as moot Defendants' motion to dismiss the Amended Complaint, without prejudice to Defendants adopting the arguments made therein in support of a motion to dismiss the Second Amended Complaint. The Second Amended Complaint (ECF 39, "SAC") was docketed on July 17, 2023. (ECF 39).

On August 16, 2023, pursuant to the Court's Order, Defendants filed their Motion to Dismiss the Second Amended Complaint or In the Alternative for Summary Judgment (ECF 40), attaching a memorandum of law in support of the motion (ECF 40-1). In their memorandum, Defendants argue for dismissal of or summary judgment on claims newly asserted in the Second Amended Complaint while adopting and incorporating the arguments made in their prior motion to dismiss regarding claims in the Amended Complaint that were retained in the Second Amended Complaint. Plaintiff filed her Response in Opposition to Defendants' Motion (ECF 41) opposing Defendants' new arguments while adopting and incorporating the arguments made in her opposition to Defendants' prior motion to dismiss and her Rule 56(d) declaration. Defendants filed a reply in support of the Motion (ECF 42). Defendants attached an exhibit to each of their briefs (ECF 40-2, 42-1), and Plaintiff attached an exhibit to her opposition brief (ECF 41-1). The new arguments raised in the most recent round of briefs focus on constitutional claims newly added to the Second Amended Complaint.

### B. Factual Background

The following facts are derived from Plaintiff's Second Amended Complaint (ECF 39), documents incorporated into the Second Amended Complaint by reference, and public records.[1]

Plaintiff, a black woman, was employed by BPD as a policy analyst from August 2017 until her termination on April 3, 2019. (SAC ¶ 13). Plaintiff began her employment with BPD in the Best Practices Unit under the supervision of defendant Lieutenant Robert Quick ("Quick"), a white man. (*Id.* ¶ 19.) "The Best Practices Unit worked on high level BPD policy development related to the consent decree BPD entered into with the United States Department of Justice . . . ." (*Id.* ¶ 23.)

Plaintiff alleges that Quick "is a racist" who "used racially inflammatory language in the Best Practices Unit[,] including 'time to get the hose' and 'white man's slavery' [in] describing a post Freddy [*sic*] Gray police department." (*Id.* ¶¶ 20–21.) Quick "often" referred to Plaintiff as "*his* workhorse," which Plaintiff alleges characterized her "as his property." (*Id.* ¶ 21.) Plaintiff informed Quick of her career goals, which included working in BPD's Government Affairs department. (*Id.* ¶ 24.) Quick "promised" that "he would arrange" for her to work part-time in Government Affairs and help her obtain a position in that department, but also said that BPD only allowed white men to work in Government Affairs. (*Id.* ¶¶ 24–25.) In September 2017, Quick hired a white woman, Lisa Fink, as a policy analyst. (*Id.* ¶ 26.) In late 2017, Plaintiff "pointed out that . . . Quick was giving her less challenging work and treating her differently than . . . Fink." (*Id.* ¶ 27.) Thereafter, Quick's demeanor towards Plaintiff "became cold and he stopped

---

[1] When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must take the factual allegations in the complaint as true, *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016), and consider documents either attached to the complaint as exhibits or incorporated by reference, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A court may also "take judicial notice of matters of public record" when considering a motion to dismiss. *Corbitt v. Baltimore City Police Dep't*, Civ. No. RDB-20-3431, 2023 WL 3793997, at *3 (D. Md. June 2, 2023).

communicating with her." (*Id.* ¶ 28.) Plaintiff alleges Quick did not arrange for her to work in Government Affairs "as previously promised." (*Id.* ¶ 29.)

In or around January 2018, Plaintiff made internal complaints about Quick's "racially discriminatory and retaliatory behavior" to the unit's first line supervisor and to Quick's supervisor, Major Martin Bartness, a white man. (*Id.* ¶ 30.) Plaintiff "also made an internal EEO complaint asserting disparate treatment, hostile work environment, and retaliation against Quick." (*Id.* ¶ 31.) Plaintiff told Major Bartness that she did not want to work under Quick's supervision and stated a preference for Government Affairs. (*Id.* ¶¶ 32–33.) Subsequently, Plaintiff was transferred to a "less desirable assignment" with BPD's Professional Development Section to work on employee health and wellness initiatives. (*Id.* ¶¶ 32–35, 37.) "Whereas her old position involved writing high level BPD policy, [Plaintiff's] new position was more of an event planner role where she was planning wellness fairs and policy writing was a small part of the job duties." (*Id.* ¶ 38.) Unlike the old position, the new position was not located at BPD headquarters. (*Id.*) Major Bartness "promise[d]" Plaintiff that the transfer to Professional Development would be temporary, but Plaintiff "remained in that role" until her termination. (*Id.* ¶ 39.) Neither Major Bartness nor anyone else "ever followed up with her regarding a new, permanent role more inline with her skills and education level." (*Id.*) Plaintiff "excelled" in the Professional Development Section, where her new supervisors gave Plaintiff the highest ratings on her annual performance evaluation and "sought to reclassify [her] position in order to give her a larger salary and additional responsibilities." (*Id.* ¶¶ 14–18, 40.)

In March 2019, defendant Jasmine Riggins-Green, a BPD officer and Plaintiff's former co-worker, initiated a complaint to Internal Affairs ("IA") against Plaintiff, and IA investigated the allegations. (*Id.* ¶¶ 46, 48.) The IA complaint and investigation followed a meeting between

Riggins-Green and Quick about Plaintiff in early 2019. (*Id.* ¶¶ 41–43.) After this meeting, Plaintiff was informed that Riggins-Green had accessed Plaintiff's personnel file. (*Id.* ¶ 44.) The IA complaint was "riddled with provably false lies[,]" including an allegation that Plaintiff told her background investigators that she had ceased contact with her husband, which was not corroborated during the IA investigation. (*Id.* ¶ 46–47.) Plaintiff had disclosed that her husband was an inmate at a Maryland correctional facility during the employment background investigation BPD conducted before she was hired, but the background investigators were "willfully blind to the exact nature of the relationship" between Plaintiff and her husband in "failing to ask natural follow up questions" in response to Plaintiff's disclosure. (*Id.* ¶ 45.)

Plaintiff was discharged on April 3, 2019. (*Id.* ¶ 50.) Plaintiff was told that the reasons for her discharge were her failure to disclose her relationship with her husband, actual visits she made with her husband, and her false denial that she visited her husband while he was incarcerated, which BPD claimed were violations of BPD Policy 302. (*Id.* ¶¶ 51–52.) Policy 302 states, "Members will refrain from making personal contacts with persons of questionable character, or visiting places where known violations of the law are occurring, unless necessary to do so in the performance of their duty." (ECF 21-4 at 3.) Plaintiff's husband was convicted of first-degree murder and sentenced to life imprisonment in 2001. (ECF 42-1.) Plaintiff contends that, during her hiring process, she did not fail to disclose her relationship with her husband or deny that she visited him and that "BPD has not discharged other employees who have visited family members who are incarcerated." (SAC ¶¶ 51, 53.) BPD also claimed that Plaintiff was terminated for "making a false statement during the investigation[,]" which Plaintiff alleges was "based on cheap pop quiz 'gotcha' tactics"; Plaintiff contends she truthfully "clarified her original answer" during the investigation. (*Id.* ¶ 54.)

After Plaintiff's termination, "BPD refused to pay out her accrued but unused comp time and submitted false and incomplete information to Maryland Department of Labor, Division of Unemployment Insurance, which resulted in the initial denial of her application, forced her to file an appeal, and delayed her benefits." (*Id.* ¶ 55.)

In May 2019, Quick directed Riggins-Green "to file a bogus petition for peace order with the court falsely claiming that she was a threat." (*Id.* ¶ 56.) On May 3, 2019, Riggins-Green filed this petition in the District Court of Maryland for Baltimore City, asserting that Plaintiff was "a risk to the Baltimore City Police Department and to police officers." (*Id.* ¶¶ 57, 59.) Plaintiff contends that the petition was "riddled with lies and half-truths . . . ." *(Id.* ¶ 57.) Plaintiff alleges, "[u]pon information and belief," that Defendants BPD Commissioner Michael Harrison and BPD Human Resources Director Amy Guevara "conspired with Quick and Riggins-Green to file a false peace order against [Plaintiff,]" noting that Harrison's name appears in the petition.[2] (*Id.* ¶ 58.)

"In response to" Riggins-Green's filing of the petition for a peace order, unspecified BPD personnel "spread false rumors about [Plaintiff] claiming that she was a dangerous fugitive and/or a criminal suspect . . . ." (*Id.* ¶ 60.) Among other things, Plaintiff alleges BPD personnel "circulat[ed] [Plaintiff's] photo to security personnel in all of the districts and at City Hall and stat[ed] that she was banned from all City buildings, issu[ed] a 'BOLO' or 'be on the lookout' to all officers representing that [Plaintiff] was a threat to the department, sen[t] sheriffs and detectives to her home and/or the homes of her family members and/or tenants, and ma[de] false and defamatory statements to family members and others asserting that a warrant had been issued for her arrest." (*Id.*) "The sheriffs came to [Plaintiff's] home and the homes of her family members

---

[2] The only place on the peace order petition where the Court has identified Commissioner Harrison's name is in the recitation of facts, where Riggins-Green states she alerted the "local law enforcement agency" regarding her safety concerns, "including Commissioner Michael Harrison in the Baltimore Police Department." (ECF 21-5 at 5.) Harrison is not named as a petitioner.

ready to draw their weapons in response to Riggins-Green's unfounded claims that [Plaintiff] was a risk to police officers." (*Id.*) On May 31, 2019, the peace order proceedings terminated with the state court finding "no statutory basis for the relief BPD was seeking." (*Id.* ¶ 61.)

## II.    LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). A motion to dismiss under Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To survive a 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint need not include "detailed factual allegations" to satisfy Rule 8(a)(2), but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up).

A complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* "[T]ender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert denied*, 566 U.S. 937 (2012).

Ordinarily, a court "is not to consider matters outside the pleadings or to resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, courts may "consider documents that are explicitly incorporated into the complaint by reference" or "document[s] submitted by the movant" that are "integral to the complaint[,]" if "there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted). Additionally, "courts may take judicial notice of publicly available records without converting a motion to dismiss to a

motion for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 502–03 (D. Md. 2019).

If the court otherwise considers matters outside the pleadings pursuant to Fed. R. Civ. P. 12(d), "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). If the court converts the motion to dismiss to a motion for summary judgment in this fashion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*. A court may not convert a motion to dismiss to one for summary judgment *sua sponte* unless it provides notice to the parties that it will do so. *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (noting that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to have notice that conversion under Rule 12(d) may occur, and the court need not "notify parties of the obvious." *Id*.

A district court has "complete discretion" to decide whether "to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion . . . thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2284 (3d ed. 2004, 2011 Supp.). Generally, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165–66.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a party's summary judgment motion "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). To avoid summary judgment, the non-moving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *see also Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 809 F.3d 463, 470 (4th Cir. 2018).

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2012). However, the non-moving party cannot "complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). "If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a [Fed. R. Civ. P. 56(d)] affidavit." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). A Rule 56(d) affidavit specifies reasons the non-moving party "cannot present facts essential to justify its opposition" to a summary judgment motion. Fed. R. Civ. P. 56(d). "[F]ailure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Harrods Ltd.*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961).

## III.   ANALYSIS

Defendants have styled their Motion as a motion to dismiss under Fed. R. Civ. P. 12(b) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. They present for the Court's consideration multiple exhibits concerning matters outside the pleadings. (ECF 21-3 to 21-5, 40-

2, 42-1.) In response, Plaintiff has opposed the Motion and submitted a declaration, pursuant to Fed. R. Civ. P. 56(d), establishing the need for discovery of certain materials and information. (ECF 29, 29-1.) Plaintiff articulates a need for discovery of documents and recorded materials related to Plaintiff's pre-hire background investigation and the IA investigation that led to her termination. (ECF 29-1 at 1–2.) She claims she needs to depose the Individual Defendants on matters relating to Defendants' involvement in the petition for a peace order that was filed against her, and statements made to the Maryland Division of Unemployment Insurance. (*Id.* at 2–4.)

Given Plaintiff's articulated need for discovery on various factual matters related to her claims, the Court will not convert Defendants' motion to dismiss to a motion for summary judgment. The Court will confine its analysis to whether the claims asserted in the Second Amended Complaint are supported by sufficient factual material to give Defendants fair notice of Plaintiff's claims and to raise Plaintiff's entitlement to relief above the speculative level. For reasons explained herein, the Second Amended Complaint fails to state plausible claims for relief and will therefore be dismissed.

### A. Count I—Discrimination and Retaliation in Violation of Title VII

In Count I of the Second Amended Complaint, Plaintiff asserts claims against BPD for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"). Title VII prohibits an employer from discriminating against an individual with respect to employment based upon the individual's race, color, religion, sex, or national origin, and from retaliating against an individual for engaging in activity protected by Title VII. *See* 42 U.S.C. § 2000e–2(a)(1) (anti-discrimination provision); 42 U.S.C. § 2000e–3(a) (anti-retaliation provision). Specifically, Title VII provides that it is an "unlawful employment practice" for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Additionally, it is unlawful for an employer to discriminate against an employee for "oppos[ing] any practice made an unlawful employment practice by [Title VII]" or because the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C.A. § 2000e-3(a).

At trial in an employment discrimination and retaliation case, the plaintiff bears the burden of proving her claims through one of two methods. The plaintiff may offer "direct or indirect" evidence of discriminatory or retaliatory animus under "ordinary principles of proof[,]" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997), or follow the burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). *See Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021). The Court may consider both methods of proving discrimination when evaluating a plaintiff's allegations under Rule 12(b)(6). The plaintiff, however, need not commit to either of the two approaches at the motion-to-dismiss stage. *Chen v. Md. Dep't of Health & Mental Hygiene*, Civ. No. ELH-15-1796, 2016 WL 4539204, at *17 (D. Md. Aug. 29, 2016).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017); *see also Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318–20 (4th Cir. 2005) (applying *McDonnell Douglas* framework to discrimination claim); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (applying *McDonnell Douglas* framework to retaliation claim). The precise formulation of the required *prima facie* showing will vary in "differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13. Nonetheless, the plaintiff

is generally required to show that the employer took adverse action against her "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If a plaintiff establishes a *prima facie* case, a presumption of illegal discrimination or retaliation arises, and the burden of production shifts to the employer to state a legitimate, non-discriminatory reason for its adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted." *Burdine*, 450 U.S. at 255. To prevail, the plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Id.* at 256.

Notably, the *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993). As the Supreme Court explained in *Swierkiewicz v. Sorema*, the "*prima facie* case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." 534 U.S. 506, 510 (2002). At the motion-to-dismiss stage, a plaintiff need not establish a *prima facie* case of discrimination or retaliation under *McDonell Douglas*, but must instead satisfy the pleading standard established in *Iqbal* and *Twombly*. *See Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017); *see also Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for all civil actions, . . . and it applies to antitrust and discrimination suits alike . . . .") (citations omitted). That is, a plaintiff does not need to allege facts sufficient to establish all elements of a *prima facie* case of employment discrimination or retaliation to avoid dismissal under Rule (12)(b)(6). She must, however, allege sufficient facts to support a reasonable inference that an adverse action was motivated by unlawful discrimination or retaliation. *See McCleary-*

*Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–86 (4th Cir. 2015); *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (holding that a complaint must "establish a plausible basis for believing . . . that race was the true basis for [the adverse employment action]"), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012).

### 1. Title VII Race Discrimination Claims

Defendants argue that Count I should be dismissed because Plaintiff fails to allege facts to support the elements of a *prima facie* case of Title VII discrimination. (ECF 21-1 at 6–12.) In her opposition, Plaintiff argues she is not required to establish a *prima facie* case to overcome a motion to dismiss and that she has alleged sufficient facts to support an inference of discrimination. (ECF 28 at 9–16.)

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show: (1) membership in a protected class; (2) an adverse employment action by the employer; (3) satisfactory job performance at the time of the adverse employment action; and (4) that the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015) (quoting *Adams v. Tr. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)). The fourth element is met if "similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

"[A] plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss . . . ." *Coleman*, 626 F.3d at 190 (citing *Swierkiewicz*, 534 U.S. at 510–15). But a plaintiff must allege sufficient facts to "'state[] a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct'" and "to raise a right to

relief above the speculative level . . . ." *Id.* (quoting *Iqbal,* 556 U.S. 662, and *Twombly*, 550 U.S. at 555).

"[S]ome adverse employment action is required" to prevail on a claim of discrimination under Title VII. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). The employer's action must "adversely affect[] the terms, conditions, or benefits of the plaintiff's employment." *Id.* (quoting *James*, 368 F.3d at 375). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Additionally, the adverse employment action must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Gaines v. Balt. Police Dep't*, Civ. No. ELH-21-1211, 2023 WL 2185779, at *12 (D. Md. Feb. 22, 2023) (quoting *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021)). An inference of unlawful discrimination is supported where "similarly-situated employees outside the protected class receive[] more favorable treatment." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *White*, 375 F.3d at 295). "'[W]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination,' the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects." *Gaines*, 2023 WL 2185779, at *12 (quoting *Swaso*, 698 Fed. App'x at 748); *see also Asi v. Info. Mgmt. Grp., Inc.*, Civ. No. GLR-18-3161, 2019 WL 4392537, at *6 (D. Md. Sept. 13, 2019) (pleading disparate-treatment discrimination claim requires plaintiff to "identify the proposed comparator and establish

a plausible basis for believing the employee was actually similarly situated") (cleaned up).

Here, Plaintiff fails to plead sufficient facts to permit a reasonable inference that BPD took an adverse employment action against her based on her race. Plaintiff argues in her opposition that the following four actions were adverse employment actions sufficient to sustain her Title VII discrimination claim: (1) Quick's disparate treatment between Plaintiff and a white co-worker; (2) Plaintiff's reassignment from a position in BPD's Best Practices Unit to the Professional Development Section in January 2018, which she argues amounted to a demotion; (3) the termination of her employment with BPD in April 2019; and (4) "the filing of a bogus peace order" in May 2019. (ECF 28 at 13, 16.) The Court addresses these arguments below, as well as Plaintiff's allegations that BPD interfered with Plaintiff's receipt of payment for compensatory time and unemployment benefits after her termination. For reasons explained below, Plaintiff's Title VII discrimination claim in Count I of the Second Amended Complaint will be dismissed.

### a.    Discrimination Claim Based on Quick's Supervision

Plaintiff alleges that, in 2017, her then-supervisor Quick gave her "less challenging work and treat[ed] her differently" than a white co-worker and "never allowed her to work in Government Affairs" part-time as he had "previously promised." (SAC ¶¶ 27–29.) These allegations fail to support a plausible claim of Title VII discrimination against BPD based upon Quick's conduct while he was Plaintiff's supervisor. Plaintiff's allegation that she was treated differently than her white co-worker does not contain adequate "factual content" to support an inference that she suffered an adverse employment action. *Iqbal*, 556 U.S. at 663. The Second Amended Complaint does not include allegations to suggest that Quick's conduct imposed any "significant detrimental effect" on Plaintiff's employment status. *Holland*, 487 F.3d at 219; *see also Forgus v. Mattis*, 753 F. App'x 150, 153 (4th Cir. 2018) (citing Fifth Circuit and Seventh

Circuit cases holding that denial of reassignment is not materially adverse); *Thornton v. Dep't of Pub. Safety & Corr. Servs.*, Civ. No. ADC-16-3028, 2019 WL 1118064, at *9 (D. Md. Mar. 11, 2019), *aff'd*, 796 F. App'x 811 (4th Cir. 2020) ("[A] mere refusal to grant a transfer that an employee desires does not qualify as an adverse employment action unless the decision 'had some significant detrimental effect' on the employee.") (quoting *Wagstaff v. City of Durham*, 233 F. Supp. 2d 739, 744 (M.D.N.C. 2002), *aff'd*, 70 F. App'x 725 (4th Cir. 2003)).[3] Therefore, none of the foregoing conduct attributed to Quick constitutes an adverse employment action for purposes of a Title VII discrimination claim. Plaintiff fails to state a Title VII discrimination claim based on this conduct.

### b. Discrimination Claim Based on the Transfer to Professional Development

Plaintiff argues that BPD discriminated against her on the basis of race when it transferred her to the Professional Development Section. Even if Plaintiff's reassignment to Professional Development constituted an adverse employment action, there are no allegations in the Second Amended Complaint to suggest that this reassignment was made and sustained for any racially discriminatory reason. The transfer was made after Plaintiff submitted internal complaints of discriminatory treatment by Quick and asked not to work under Quick's supervision. (SAC ¶¶ 30–35.) There are no allegations that Major Bartness, the apparent decisionmaker behind Plaintiff's reassignment, bore any racially discriminatory bias or animus toward Plaintiff. Nor are there

---

[3] Any discrimination claim based upon BPD's failure to transfer Plaintiff to Government Affairs also fails on a failure-to-promote theory. "In order to properly plead a failure-to-promote claim under Title VII . . . , a plaintiff must allege specific facts establishing four elements that could plausibly meet the satisfaction of the factfinder[:]" "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference" of liability. *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 & n.5 (4th Cir. 2004)). Here, Plaintiff does not allege that she applied for any position in Government Affairs or that she was rejected for a position in Government Affairs under circumstances that support an inference of unlawful discrimination.

allegations that any similarly situated BPD employee received a more favorable transfer upon request. For these reasons, the facts alleged in the Second Amended Complaint are inadequate to support a Title VII discrimination claim based upon Plaintiff's reassignment to the Professional Development Section.

   **c.**  **Discrimination Claim Based on the Termination of Plaintiff's Employment**

   The termination of Plaintiff's employment clearly constitutes an adverse employment action for purposes of a Title VII discrimination claim. *See Lim v. Azar*, 310 F. Supp. 3d 588, 602 (D. Md. 2018) (finding that plaintiff's "termination undoubtedly qualifie[d] as an adverse employment action"). However, Plaintiff does not allege any facts to suggest that the termination was based on Plaintiff's race. According to the Second Amended Complaint, Plaintiff's employment with BPD was terminated in April 2019, following an IA investigation that began in March 2019. (SAC ¶¶ 48–50.) Plaintiff was told that she was discharged for failing to disclose her relationship with her incarcerated husband and falsely denying that she had visited him, which, according to BPD, were violations of BPD Policy 302. (*Id.* ¶¶ 51–54.) Plaintiff alleges that "BPD has not discharged other employees who have visited family members who are incarcerated." (*Id.* ¶ 53.) But Plaintiff does not identify any other BPD employees who visited incarcerated family members, allege facts to show that any such employees were similarly situated to her, or allege that any such employees were outside Plaintiff's protected class. In sum, Plaintiff fails to plead that her discharge was racially discriminatory. *See Lim*, 310 F. Supp. 3d at 603 (dismissing Title VII claim of discriminatory termination where plaintiff fails to allege "facts that could reasonably support the claim that his termination was based on race, color, or national origin").

   Plaintiff alleges that Guevara, Riggins-Green, and Quick "all substantially took part in the process to terminate [Plaintiff's] employment." (SAC ¶ 50.) She claims Quick, at least, had

previously used "racially inflammatory language . . . ." (*Id.* ¶ 21.) But Plaintiff does not allege that Quick, Guevara, or Riggins-Green made the decision to terminate Plaintiff's employment or that any of them were in a position to make such a decision on behalf of BPD.

"Generally, employers are liable only for the acts of employees with supervisory authority who are empowered to make 'tangible employment decisions.'" *Ousley v. McDonald*, 648 F. App'x 346, 348 (4th Cir. 2016) (quoting *Hill v. Lockheed Martin Logistics,* 354 F.3d 277, 287 (4th Cir. 2004), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). Under the "cat's paw theory of liability," an employer can be liable for unlawful discrimination "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action . . . ." *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). However, "a supervisor's discriminatory animus may support liability only if the supervisor was, in effect, principally responsible for, or the actual decisionmaker behind, the action, such as when the formal decisionmaker simply rubberstamped the supervisor's recommendation." *Lim*, 310 F. Supp. 3d at 602 (cleaned up); *see also Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 443 (D. Md. 2015) ("The 'cat's paw' or 'rubber stamp' theory imposes liability on an employer for the discriminatory motivations of a supervisor who was 'principally responsible' for an adverse employment decision, even if that supervisor was not the formal decisionmaker.") (quoting *Hill*, 354 F.3d at 288). Cat's paw liability is not supported by a supervisor "merely hav[ing] 'substantial influence on the ultimate decision' or play[ing] a 'significant' role in the decision . . . ." *Lim*, 310 F. Supp. 3d at 602 (quoting *Hill*, 354 F.3d at 291).

The facts alleged in the Second Amended Complaint are inadequate to support BPD's liability for Title VII discrimination on a cat's paw theory. Quick is the only individual alleged in the Second Amended Complaint to harbor any discriminatory bias or animus. (*See* SAC ¶¶ 20–22). The Second Amended Complaint contains no facts to suggest any discriminatory bias or animus by either Riggins-Green or Guevara. Plaintiff alleges that Quick, along with Riggins-Green and Guevara, "substantially took part in the process to terminate her employment." (*Id.* ¶ 50.) However, Plaintiff does not allege facts to support a reasonable inference that Quick was "principally responsible for, or the actual decisionmaker behind," the termination decision such that BPD "simply rubberstamped [his] recommendation." *Lim*, 310 F. Supp. 3d at 602. The Second Amended Complaint is clear that Quick was not Plaintiff's supervisor at the time Plaintiff's employment was terminated in April 2019, and he had not been Plaintiff's supervisor since approximately January 2018.[4] Plaintiff merely alleges that Quick was among several individuals at BPD who "substantially" participated in the "process" that resulted in Plaintiff's termination. (SAC ¶ 50.) Without more, Quick's alleged participation in this process does not support a Title VII discrimination claim based on any alleged discriminatory bias or animus by Quick. *See Lim*, 310 F. Supp. 3d at 602.

For the foregoing reasons, Plaintiff fails to state a Title VII claim for discriminatory termination.

### d.    Discrimination Claim Based on Interference with Benefits

Plaintiff alleges that, after terminating her employment, "BPD refused to pay out her accrued but unused comp time" and "submitted false and incomplete information" in connection

---

[4] In *Smyth-Riding*, 699 F. App'x 146, 155–56 (4th Cir. 2017), a panel of the Fourth Circuit declined to apply the cat's paw theory to the conduct of supervisors who were alleged to have retaliatory animus toward the plaintiff but lacked supervisory authority of the plaintiff.

with Plaintiff's unemployment claim, which ultimately delayed her benefits. (SAC ¶ 55.) The facts alleged in the Second Amended Complaint fall short of establishing that either of these actions by BPD constituted an adverse employment action. *See David v. Winchester Med. Ctr.*, 759 F. App'x 166, 169 (4th Cir. 2019) ("[Plaintiff's] pleadings do not allow us to conclude that she was ever entitled to a [paid time off] payment."); *Suteerachanon v. McDonald's Restaurants of Maryland, Inc.*, Civ. No. RWT-13-2889, 2014 WL 6674587, at *4 (D. Md. Nov. 24, 2014), *aff'd*, 607 F. App'x 339 (4th Cir. 2015) ("A mere delay in receiving her benefits does not constitute an adverse employment action . . . ."); *Craft v. Fairfax Cnty. Gov't*, No. 1:16-CV-86 (JCC/MSN), 2016 WL 1643433, at *5 (E.D. Va. Apr. 26, 2016) ("The slight, quickly resolved delay in processing Plaintiff's application for disability retirement was not an adverse employment action for purposes of Title VII, as it did not adversely affect the terms, conditions, or benefits of Plaintiff's employment.").

Moreover, even if these actions were adverse employment actions, Plaintiff again fails to plead facts to suggest that either of them was taken on account of Plaintiff's race, such as disparate treatment of similarly situated BPD employees of another race. Therefore, the Second Amended Complaint fails to state a claim for Title VII discrimination based on BPD's alleged refusal to compensate Plaintiff for unused compensatory time and alleged interference with Plaintiff's application for unemployment benefits.

### e.    Peace Order Petition

The filing of the petition for a peace order against Plaintiff following the termination of her employment does not constitute an adverse employment action because it could not have adversely affected "terms, conditions, or benefits" of employment that had been terminated. *Holland*, 487 F.3d at 219. Moreover, there are no allegations in the Second Amended Complaint that suggest

that the peace order petition was filed against Plaintiff on account of her race. Therefore, Plaintiff cannot state a claim for Title VII discrimination based upon the peace order petition.

### 2.  Title VII Racial Harassment

In a footnote to one of her briefs, Plaintiff states that her pleading contains "sufficient facts for a discrimination claim under a racial harassment theory . . . ." (ECF 28 at 17 n.2.) The Court disagrees.

"Title VII prohibits racial or sexual harassment that creates a hostile work environment for the harassed employee." *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020). A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015)). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116–17 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)). But even "an isolated incident of harassment, if extremely serious, can create a hostile work environment." *Boyer-Liberto*, 786 F.3d at 268. "[T]o prevail on a Title VII claim that a workplace is racially hostile, 'a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Id.* at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)).

The only allegations in the Second Amended Complaint concerning unwelcome conduct Plaintiff experienced based on race are her allegations that Quick "used racially inflammatory

language in the Best Practices Unit . . . ." (SAC ¶ 21.) The specific examples of such language provided in the Second Amended Complaint are the expressions "time to get the hose" and "white man's slavery," which Quick is alleged to have used in "describing a post Freddy [*sic*] Gray police department." (*Id.*) There are no allegations concerning how frequently Quick used these expressions or other offensive expressions or in what contexts he used them, which may support a reasonable inference that his use of such language was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment . . . ." *Boyer-Liberto*, 786 F.3d at 277. Without context, a single use of such expressions would not be so "extremely serious" to create a hostile work environment, *id.* at 268, even when viewed in a light most favorable to Plaintiff.

Plaintiff also alleges that Quick referred to her as "*his* workhorse," which Plaintiff describes as implying she was Quick's property. (SAC ¶ 21.) Divorced from context, referring to a subordinate employee as one's "workhorse" is highly susceptible to a non-racial and non-derogatory interpretation, even if distasteful or offensive to some. *See Workhorse*, Merriam-Webster's Collegiate Dictionary (11th ed.) (includes definition of "workhorse" as "a person who performs most of the work of a group task" and "a hardworking person," without any race-related or derogatory connotation).

For these reasons, to the extent Plaintiff alleges racial harassment under Title VII in Count I, the Second Amended Complaint fails to state a plausible claim for relief under this theory.

### 3.   Title VII Retaliation Claims

Apart from Plaintiff's Title VII discrimination claim, Count I of the Second Amended Complaint asserts a claim against BPD for retaliation under Title VII. Defendants argue that the retaliation claim should be dismissed because Plaintiff cannot demonstrate an adverse action or a causal connection between any adverse action and her complaints of discrimination. (ECF 21-1 at

13–15; ECF 30 at 5–8.) Plaintiff argues that the Second Amended Complaint includes sufficient facts for her retaliation claim to survive a motion to dismiss. (ECF 28 at 16–17.)

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing of a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted). If the plaintiff "establish[es] a *prima facie* case of retaliation, the burden shifts to the [employer] to articulate a legitimate, non-retaliatory reason for the adverse employment action." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005). If the employer makes this showing, the plaintiff must demonstrate that the employer's articulated reasons are a mere pretext for retaliation. *Foster*, 787 F.3d at 250 (citation omitted). Ultimately, "Title VII retaliation claims require proof that *the desire to retaliate* was the but-for cause of the challenged employment action." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017) (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (emphasis added). As previously noted, "a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss . . . ." *Coleman*, 626 F.3d at 190 (citing *Swierkiewicz*, 534 U.S. at 510–15). But a plaintiff is required to allege sufficient facts to "'state[] a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct'" and "to raise a right to relief above the speculative level . . . ." *Id.* (quoting *Iqbal,* 556 U.S. 662, and *Twombly*, 550 U.S. at 555).

In her opposition, Plaintiff argues she engaged in protected activity by "point[ing] out" Quick's disparate treatment of Plaintiff and a white co-worker, submitting internal complaints to Sergeant White and Major Bartness regarding Quick's "discriminatory and retaliatory behavior,"

and filing an "internal EEO complaint asserting disparate treatment, hostile work environment, and retaliation against Quick." (ECF 28 at 17; SAC ¶¶ 27, 30, 31.) Plaintiff's internal complaints of race discrimination constitute protected activities under Title VII. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) ("Protected activity under Title VII includes complaints of discrimination based upon race, color, religion, sex or national origin . . . . Complaints raised through internal company procedures are recognized as protected activity.") (cleaned up); *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (Title VII protected activity includes "informal protests, such as voicing complaints to employers or using an employer's grievance procedures . . . ."). Plaintiff argues her protected activities were followed by materially adverse actions taken against her by BPD—specifically, that "she was initially demoted, ultimately terminated, and needlessly and unlawfully harassed after her termination . . . ." (ECF 28 at 17; SAC ¶¶ 35–39, 50–51, 56–60.)

For reasons explained below, Plaintiff's Title VII retaliation claims will be dismissed.

### a. Retaliation Claim Based on the Transfer to Professional Development

Plaintiff argues that her reassignment from BPD's Best Practices Unit to the Professional Development Section in January 2018 "was effectively a demotion" and constituted a materially adverse action taken in retaliation for her complaints of discrimination. (ECF 28 at 13, 17.) Defendants argue that Plaintiff's transfer to Professional Development was neither a demotion nor an adverse action but was a continuation of Plaintiff's previous role involving the same type of work. (ECF 21-1 at 13; ECF 30 at 5–7.) In addition, Defendants contend that "Plaintiff was transferred *at her own request* to another unit" and that the transfer was an accommodation for her request. (ECF 21-1 at 9–12; ECF 30 at 4, 5, 7.) Defendants also argue that Plaintiff fails to connect her reassignment to the termination of her employment more than a year later. (ECF 30 at 2–5.)

Even assuming the facts in the Second Amended Complaint were sufficient to allege that Plaintiff's transfer to Professional Development was materially adverse,[5] they do not support an inference that the transfer was made in retaliation for Plaintiff's internal complaints of disparate treatment. In Count I, Plaintiff alleges that BPD "treat[ed] her differently and less favorably than similarly situated White employees and retaliat[ed] against her for opposing unlawful discrimination by, among other things, subjecting her to disparate treatment that ultimately culminated in her discharge in violation of Title VII." (SAC ¶ 63.) There is no allegation in the Second Amended Complaint that Plaintiff's transfer to Professional Development was retaliatory. Plaintiff also fails to allege any facts to suggest that Major Bartness, the alleged decisionmaker behind the reassignment, bore any retaliatory motive or animus toward Plaintiff. And Plaintiff does not allege any facts to support an inference that Plaintiff's allegedly discriminatory and retaliatory termination was connected in any way to her reassignment to Professional Development more than a year prior.

The Court recognizes the temporal proximity between Plaintiff's complaints against Quick and reassignment to Professional Development. However, the face of the Second Amended Complaint offers an obvious non-retaliatory explanation for the reassignment. Specifically,

---

[5] Importantly, the requirement of a "materially adverse action" necessary to sustain a claim of retaliation under Title VII "is different from an adverse employment action required for a disparate treatment claim." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019). A claim of retaliation under Title VII requires an action by the employer that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted). "[W]hile factors other than the terms and conditions of employment may be examined" to determine whether a materially adverse action has occurred for purposes of a Title VII retaliation claim, "this is still a heavy burden for the plaintiff: the alleged adverse action must be *material*." *Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006) (citing *White*, 548 U.S. at 63–67). Although "[r]etaliatory work assignments" have been regarded as a "classic" example of unlawful workplace retaliation, the Supreme Court has recognized that "reassignment of job duties is not automatically actionable" under Title VII's anti-retaliation provision. *White*, 548 U.S. at 71 (2006). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) (cleaned up).

Plaintiff submitted complaints to Major Bartness regarding Quick's discriminatory and retaliatory conduct and advised Major Bartness that she did not want to work under Quick's supervision. Major Bartness told Plaintiff the placement would be temporary, but ultimately failed to follow up with Plaintiff about reassignment elsewhere. However, Plaintiff "excelled in her new role" in Professional Development, (SAC ¶ 40), and there is no allegation that she ever sought or requested transfer away from this new assignment. *See Hunter v. Amazon.com Servs., LLC*, No. 321CV00258FDWDSC, 2021 WL 5291912, at *4 (W.D.N.C. Nov. 12, 2021) (dismissing Title VII retaliation claim where "inference of retaliation is not plausible given the 'obvious alternative explanation' for [plaintiff's] termination") (quoting *McCleary-Evans*, 780 F.3d at 588); *Hamilton v. Prince George's Cnty., Maryland*, Civ. No. DKC 17-2300, 2019 WL 4735429, at *6 (D. Md. Sept. 27, 2019) (finding that plaintiffs' requests for workplace transfer "belies the argument that the transfer was 'causally linked' to any protected activity").

In sum, the Second Amended Complaint does not allege that Plaintiff's transfer to Professional Development was retaliatory. The pleading contains facts providing "obvious alternative explanation[s]" for Plaintiff's reassignment to Professional Development and retention in that assignment. *McCleary-Evans*, 780 F.3d at 588 (citing *Iqbal*, 556 U.S. at 682). Ultimately, the facts alleged in the Second Amended Complaint, viewed in the light most favorable to Plaintiff, do not provide a plausible basis upon which to believe that the reassignment was made in retaliation for Plaintiff's protected activity. Any retaliation claim based on this reassignment will be dismissed.[6]

---

[6] Insofar as Plaintiff asserts that actions taken while she remained under Quick's supervision constituted retaliation under Title VII, this claim fails and will be dismissed. Plaintiff alleges that, after she pointed out Quick's alleged "discriminatory and retaliatory behavior[,]" he "became cold[,]" "stopped communicating with her[,]" and "never allowed her to work in Government Affairs" as he had promised. (SAC ¶¶ 28, 29.) However, "Title VII . . . does not set forth a general civility code for the American workplace." *White*, 548 U.S. at 68 (cleaned up). As alleged, Quick's conduct is not actionable under Title VII because the Second

      **b.**  **Retaliation Claim Based on the Termination of Plaintiff's Employment and Subsequent Actions**

Plaintiff argues that BPD also retaliated against her for engaging in Title VII protected activities by terminating her employment and subsequently initiating a peace order proceeding against her. (ECF 28 at 17; SAC ¶¶ 50, 57.) Plaintiff further alleges that, following her termination, "BPD refused to pay out her accrued but unused comp time" and "submitted false and incomplete information to Maryland Department of Labor, Division of Unemployment Insurance," which caused her unemployment claim to be denied initially, "forced her to file an appeal, and delayed her benefits." (SAC ¶ 55.)

The Second Amended Complaint fails to plead enough facts to suggest that any of the foregoing actions "occurred because of the protected activity" or that any of these actions "bears sufficient temporal proximity to the protected activity." *Staggers v. Becerra*, Civ. No. ELH-21-0231, 2021 WL 5989212, at *22 (D. Md. Dec. 17, 2021) (citations omitted). Plaintiff's Title VII retaliation claim requires a causal relationship between her protected activities and the adverse actions allegedly taken by her employer. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). To plead a causal relationship between her protected activities and the employer's adverse action, a plaintiff may allege facts to "suggest that the adverse action occurred because of the protected activity" or that "the adverse act bears sufficient temporal proximity to the protected activity." *Staggers*, 2021 WL 5989212, at *22 (quoting *Roberts*, 998 F.3d at 123, and *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021)) (cleaned up). "A lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Constantine*

---

Amended Complaint does not describe any significant harm it had on Plaintiff that objectively would have dissuaded a reasonable employee from engaging in Title VII protected activities.

*v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

BPD's termination of Plaintiff's employment in April 2019 and subsequent actions all occurred well over a year after her internal complaints of discrimination in January 2018. This gap in time cannot support a reasonable inference of a causal relationship between Plaintiff's protected activities and BPD's alleged adverse actions. *See Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 789–90 (D. Md. 2013) ("The Fourth Circuit has found that a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.' . . . [And] a three-year lapse between the time when the employer became aware of the protected activity and an adverse employment action was a 'lengthy time lapse' that 'negates any inference that a causal connection exists between the two.'") (quoting *King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003), and *Dowe*, 145 F.3d at 657).

According to the Second Amended Complaint, Plaintiff's termination was preceded by an IA complaint against Plaintiff submitted by Riggins-Green and an IA investigation of Plaintiff's conduct, both of which occurred in March 2019 and concerned Plaintiff's disclosures to BPD about her relationship with her spouse, an incarcerated person. (SAC ¶¶ 46–49.) Plaintiff was advised that "she was discharged for failing to disclose the relationship with her husband and falsely denying that she had visited him." (*Id.* ¶ 51.) She alleges that Riggins-Green's IA complaint "was riddled with provably false lies" and that the IA investigation "was a complete ruse." (*Id.* ¶¶ 46, 49.) The Second Amended Complaint fails to identify any causal connection between these events and Plaintiff's complaints of discrimination more than a year prior.

Plaintiff alleges that, at the direction of Quick in May 2019, Riggins-Green filed "a bogus petition for peace order . . . falsely claiming that [Plaintiff] was a threat." (*Id.* ¶¶ 56, 57, 59.) Plaintiff further alleges, "[u]pon information and belief," that Harrison and Guevara "conspired with Quick and Riggins-Green" to file the petition. (*Id.* ¶ 58.) Riggins-Green stated in the petition that Plaintiff sent her "a threatening text message" on May 1, 2019, "on the heels of" BPD's termination of Plaintiff's employment, and that Plaintiff was "angry" with Riggins-Green for reporting her to IA. (ECF 21-5 at 3–4.)[7] Again, the Second Amended Complaint fails to identify any causal connection between the foregoing events and Plaintiff's discrimination complaints more than a year prior.

The Second Amended Complaint fails to state a plausible claim of discrimination or retaliation under Title VII. The Title VII claims in Count I will be dismissed.

**B. Counts II and IV—Violations of 42 U.S.C. §§ 1983 and 1981**

In Count II of the Second Amended Complaint, Plaintiff asserts claims under 42 U.S.C. § 1983 against all Defendants for race discrimination and retaliation in the making and enforcement of contracts, and for violations of rights of association and due process. In Count IV, Plaintiff asserts a claim under 42 U.S.C. § 1981 against Individual Defendants for unlawful race discrimination and retaliation in the making and enforcement of contracts. Plaintiff states that the § 1981 claim in Count IV is pleaded in the alternative to race discrimination and retaliation claims

---

[7] A copy of the peace order petition is docketed at ECF 21-5. The Court may properly consider this document without converting Defendants' Motion pursuant to Fed. R. Civ. P. 12(d) because the document is incorporated into the Second Amended Complaint by reference, is integral to the Second Amended Complaint, and bears stamps indicating authenticity. *See Goines*, 822 F.3d at 165–66; *Trimble Navigation*, 484 F.3d at 705. Plaintiff does not contest the authenticity of the exhibit and relies upon it in asserting the legal claims made in the Second Amended Complaint. *See Chesapeake Bay Found.*, 794 F. Supp. 2d at 611. Moreover, the petition is a public court document and therefore a matter of public record of which judicial notice may properly be taken. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

in Count II, in case the Individual Defendants assert as a defense that they "were not acting in their official capacities and/or outside the scope of their employment." (ECF 28 at 24.) The Court will address these two counts jointly.

Section 1983 provides a cause of action against a person who, acting under color of state law, subjects a person within the jurisdiction of the United States to the deprivation of federal rights. 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a 'person acting under the color of state law.'" *Gaines*, 2023 WL 2185779, at *23 (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).[8] "A person acts under color of state law only when exercising power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at *24 (quoting *Polk County v. Dodson*, 454 U.S. 312, 317–18 (1981)) (cleaned up). Importantly, "[t]here is no respondeat superior liability under § 1983." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)); *see also Gaines*, 2023 WL 2185779, at *24 (citing *Iqbal*, 556 U.S. at 676).

Here, Count II of the Second Amended Complaint seeks to enforce several distinct federal rights: the federal right under § 1981 "to be free from discrimination based on race in the making and enforcement of contracts[,]" (SAC ¶ 68), as well as federal constitutional rights to marriage and to privacy and association in relation to marriage. (SAC ¶¶ 71–74.) Plaintiff also asserts that the policy "used to justify" termination of her employment, BPD Policy 302, is unconstitutionally

---

[8] "BPD is a 'person' subject to suit under § 1983" and "does not enjoy state sovereign immunity for purposes of a § 1983 claim." *Gaines*, 2023 WL 2185779, at *25 (citations omitted).

vague and overbroad, in violation of federal constitutional rights to due process. (SAC ¶¶ 75–80.)[9] The Court will address Plaintiff's § 1981 claims in Counts II and IV separately from her constitutional claims in Count II.

### 1. Section 1981 Claims

Plaintiff's § 1981 claims in Counts II and IV are largely based upon the same allegedly discriminatory and retaliatory conduct Plaintiff cites in support of her Title VII claims in Count I.

Section 1981 provides in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). These rights "are protected against impairment by nongovernmental discrimination and impairment under color of State law[,]" 42 U.S.C. § 1981(c), including by retaliation for opposing race discrimination in employment, *see Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 172 (4th Cir. 2020), *as amended* (Oct. 16, 2020) (quoting *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008)).

"To state a claim for race discrimination under § 1981, a plaintiff must allege 1) membership in a protected class; 2) satisfactory job performance; 3) adverse employment action;

---

[9] Plaintiff argues in her second opposition brief that she has also asserted a claim under the Equal Protection Clause of the Fourteenth Amendment separate from her claims of discrimination under 42 U.S.C. § 1981. (ECF 41 at 2, 5.) The Court recognizes no such equal protection claim from the face of the Second Amended Complaint. Plaintiff argues that "BPD's Policy 302 unlawfully penalizes employees who have incarcerated spouses because of their marriage and that category of individuals is a suspect class subject to review under strict scrutiny." (*Id.* at 5.) The Supreme Court has held that governmental classifications based on race, nationality, and alienage "are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971). The Court has described suspect classes as "discrete and insular" minority groups, *id.* at 372, "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process . . . ." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). Plaintiff provides no facts or argument and cites no case law to support the proposition that police department employees with incarcerated spouses are a suspect class, and no such allegation appears in the Second Amended Complaint.

and 4) different treatment from similarly situated employees outside the protected class." *Gaines*, 2023 WL 2185779, at *24 (quoting *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 703 (4th Cir. 2023)) (cleaned up). "[T]o state a § 1981 retaliation claim, a plaintiff must allege facts rendering it plausible that, but for her participation in protected activity, she would not have suffered a materially adverse action." *Ali*, 832 F. App'x at 172–73 (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217–18 (4th Cir. 2016)). The U.S. Court of Appeals for the Fourth Circuit has recognized that the elements required to establish race discrimination, racial harassment, and retaliation are the same under Title VII and 42 U.S.C. §§ 1981 and 1983. *See Love-Lane*, 355 F.3d at 786 ("elements required to establish [race discrimination] are the same under [Title VII and §§ 1981 and 1983]"); *Boyer-Liberto*, 786 F.3d at 277 ("same test applies to" hostile work environment claims under Title VII and § 1981); *Guessous*, 828 F.3d at 217 ("elements of [Title VII and § 1981] retaliation claims are identical").

The Second Amended Complaint fails to state a claim under § 1983 against BPD in Count II for violating § 1981. BPD is not vicariously liable under § 1983 for any discriminatory conduct by its employees; it "is only liable [under § 1983] for acts that it has 'officially sanctioned or ordered.'" *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "[L]ocal governmental bodies may be liable under § 1983 . . . only where [individual] defendants were executing an 'official municipal policy' that resulted in a violation of the plaintiff's rights." *Gaines*, 2023 WL 2185779, at *25 (quoting *Monell*, 436 U.S. at 691). "Official municipal policy includes . . . practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

The Second Amended Complaint fails to identify any official policy or custom within BPD that caused a violation of Plaintiff's right under § 1981 against race discrimination in employment.

The only BPD policy or custom identified in the Second Amended Complaint is Policy 302, the policy Plaintiff was discharged for violating. The Second Amended Complaint contains no allegations that Policy 302 was the basis for race discrimination against Plaintiff. Therefore, Plaintiff fails to state a claim under § 1983 against BPD in Count II based upon any violation of § 1981.

As explained in Part II.A *supra*, Plaintiff fails to state a claim of race discrimination, race-based harassment, or retaliation under Title VII in Count I of the Second Amended Complaint. For the same reasons, Plaintiff's race discrimination and retaliation claims under 42 U.S.C. §§ 1981 and 1983 in Counts II and IV against Individual Defendants fail for inadequate pleading and will be dismissed. *See Gaines*, 2023 WL 2185779, at *30–31 (dismissing race discrimination claim under §§ 1981 and 1983 where plaintiff fails to state a race discrimination claim under Title VII).

### 2. Constitutional Claims

Plaintiff's constitutional claims are newly added to Count II of the Second Amended Complaint. (SAC ¶¶ 70–83.) These claims are largely based upon the proposition that BPD's enforcement of Policy 302 against her in connection with her termination was unconstitutional.

Plaintiff brings her constitutional claims under 42 U.S.C. § 1983 for violations of federally protected rights to marriage and free association. The right to the private and intimate association involved in a marital relationship is protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment. *See Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996) ("The right to marry is both a fundamental substantive due process and associational right.") (citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967), and *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984)). "The First Amendment protects two types of association: expressive association and intimate association." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir.

2009) (citing *Roberts*, 468 U.S. at 617–18). The right of expressive association refers to the "right to associate for the purpose of engaging in those activities protected by the First Amendment— speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618. The right of intimate association refers to the freedom to choose to enter into and maintain certain intimate human relationships. *Id.* at 617–18. Certain personal relationships are protected from undue governmental intrusion as a fundamental aspect of personal liberty. *See id.* at 618; *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). This right encompasses the personal relationships that attend the creation and sustenance of a family— marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. *Roberts*, 468 U.S. at 619. The right to marriage has been held by the U.S. Supreme Court to be both "a fundamental liberty protected by the Due Process Clause" and "part of the fundamental 'right of privacy' implicit in the . . . Due Process Clause." *Zablocki v. Redhail*, 434 U.S. 374, 383–84 (1978).

In Count II, Plaintiff asserts that "Defendants violated Plaintiff's constitutional fundamental right to privacy as it relates to her marriage" and "violated Plaintiff's constitutional First Amendment right of free association" in terminating her employment. (SAC ¶¶ 71, 72.) She alleges her employment was terminated for engaging in constitutionally protected conduct. (*Id.* ¶¶ 72, 74.) Plaintiff further states that BPD Policy 302 is "vague and overbroad" and has been enforced "in an arbitrary and capricious manner." (*Id.* ¶¶ 75–80.) The Court construes the foregoing portions of Count II as asserting claims under § 1983 for First Amendment retaliation, interference with rights of marriage and intimate association, vagueness, and overbreadth, and will address each of these claims in turn.

### a.    First Amendment Retaliation

Plaintiff fails to state a claim for First Amendment retaliation.

"The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). "[A] public employer is prohibited from discharging . . . one of its employees on a basis that infringes the employee's constitutionally protected interest in freedom of speech." *Edwards v. City of Goldsboro*, 178 F.3d 231, 245–46 (4th Cir. 1999) (citing *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)). However, a public employee's First Amendment freedoms are not absolute. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Further, "[a]s an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies." *McVey*, 157 F.3d at 277.

A § 1983 claim by a public employee against her government employer for retaliatory discharge in violation of the First Amendment is evaluated under a three-prong test: (1) "the public employee must have spoken as a citizen . . . on a matter of public concern[;]" (2) "the employee's interest in the expression at issue must have outweighed the employer's interest in providing effective and efficient services to the public[;]" and (3) "there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (citing *McVey*, 157 F.3d at 277–78) (cleaned up). "The threshold question" is "whether the employee's speech addressed a matter of public concern," the first prong of the *McVey* test. *Id.* at 316 n.26 (quoting *Rankin,* 483 U.S. at 384).

Whether the speech at issue involves a matter of public concern is a question of law that requires examination of "the content, context, and form" of the employee's speech. *Edwards*, 178 F.3d at 246, 247 (citing *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). This inquiry "rests on

36

'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'" *Id.* at 247 (quoting *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985)). "Speech involves a matter of public concern if it affects the social, political, or general well-being of a community." *Id.* at 246 (citing *Connick*, 461 U.S. at 146).

In *Edwards*, the Fourth Circuit recognized "[t]he right to associate in order to express one's views" as "'inseparable' from the right to speak freely." 178 F.3d 231, 249 (4th Cir. 1999) (citing *Cromer v. Brown,* 88 F.3d 1315, 1331 (4th Cir. 1996)). "However, as in the public employee freedom of speech context, a public employee's corresponding right to freedom of association is not absolute. Logically, the limitations on a public employee's right to associate are 'closely analogous' to the limitations on his right to speak." *Id.* (quoting *Wilton v. Mayor & City Council*, 772 F.2d 88, 91 (4th Cir. 1985)).

Therefore, the threshold question for any claim of retaliatory discharge based on exercise of an employee's First Amendment right of association is whether the association at issue involved matters of public concern. *See Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1081–82 (10th Cir. 2011) (holding that "the public-concern requirement" applies to claims of retaliation based on association rights); *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) ("[A] public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern."); *Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir. 1999) ("[A] public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern."); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985) (holding that *Connick* applies to freedom-of-association

claims); *Sheaffer v. Cnty. of Chatham*, 337 F. Supp. 2d 709, 719 n.2 (M.D.N.C. 2004) ("[T]he court applies the same considerations to Plaintiff's freedom of association allegations as to her free speech allegations.") (citing *Edwards*, 178 F.3d at 249).[10]

Plaintiff's First Amendment retaliation claim fails to cross this threshold. Plaintiff has made no allegation that her association with her spouse involved matters of public concern. Plaintiff argues in opposition to the Motion that her "visitation of her incarcerated husband constitutes speech/association on an important public issue—the fundamental right to marry recognized in *Loving*, 388 U.S. 1 (1967), and *Obergefell*, 576 U.S. 644 (2015)." (ECF 41 at 6.) She contends that "[t]his associational speech relates to ongoing public debates regarding rights of the incarcerated and their spouses." (*Id*.) But Plaintiff falls short of alleging that her association and contacts with her spouse were based on discussing or advancing any matter of public concern. The Court agrees that "the fundamental right to marry" and the "rights of the incarcerated and their spouses" are matters that affect "the social, political, or general well-being of a community." *Edwards*, 178 F.3d at 246, 246. Still, Plaintiff fails to allege that any of the foregoing matters of public concern were the subject or purpose for her visits with her spouse. Arguments of counsel made in an opposition brief cannot be taken to cure a complaint that fails to state a plausible claim. *See Sager v. Hous. Comm'n*, 855 F. Supp. 2d 524, 557 (D. Md. 2012) ("It is axiomatic that the

---

[10] Plaintiff cites the decision of the U.S. Court of Appeals for the Eleventh Circuit in *Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cnty.*, 809 F.2d 1546, 1558 (11th Cir. 1987), for the proposition that *Connick*'s public-concern requirement "is inapplicable to freedom of association claims." (ECF 41 at 6 n.3.) The Eleventh Circuit's holding in *Hatcher* is clearly at odds with the Fourth Circuit's holding in *Edwards*, and Fourth Circuit precedent is binding on this Court. Moreover, several courts have noted a circuit split on this issue and recognized that "the majority of circuits that have addressed the issue have . . . concluded that the public-concern requirement applies to claims that a government employer retaliated for exercise of the instrumental right of association." *Merrifield*, 654 F.3d at 1083 (citing *Edwards*, 178 F.3d at 249–50, and other cases); *see also Killion v. Coffey*, 696 F. App'x 76, 78 (3d Cir. 2017) ("[O]ur Court has not definitively decided whether the public concern requirement applies to First Amendment freedom of association retaliation claims, though a majority of our sister circuits have found that it does.").

complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted).

Even if Plaintiff's visits with her spouse were conducted to discuss matters of public concern, there are no facts in the Second Amended Complaint to suggest any causal nexus between such associational conduct and the termination of Plaintiff's employment. It is apparent from the facts alleged in the pleading that BPD became aware of Plaintiff's visits with her spouse before her termination. Plaintiff, however, does not allege that BPD was aware that Plaintiff's visits with her spouse involved matters of public concern. If BPD was not aware that the visits involved matters of public concern, its decision to terminate her employment could not have been in retaliation for such constitutionally protected associational conduct.

For the foregoing reasons, the Second Amended Complaint fails to state a claim for First Amendment retaliation.

### b.     Interference with Rights to Marry and to Intimate Association

Plaintiff also fails to state claim under § 1983 that Defendants unlawfully interfered with or burdened her rights to marriage and intimate association.

Constitutional protection of the right to marry as a fundamental right "do[es] not mean . . . that every state regulation which relates in any way to the incidents of . . . marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Zablocki*, 434 U.S. at 386. Governmental interference with a public employee's right to marriage and intimate association is only subject to strict scrutiny if the interference is direct and substantial. *Waters v. Gaston Cnty., N.C.*, 57 F.3d 422, 426 (4th Cir. 1995); *see also Hampton v. Edgerton*, 645 F. App'x 301, 301–02 (4th Cir. 2016) ("Where government action implicates a fundamental

right, it will be subject to strict scrutiny only where the action 'interferes directly and substantially with the fundamental right.'") (quoting *Waters*, 57 F.3d at 426); *Woodard v. Cnty. of Wilson*, 393 F. App'x 125, 127 (4th Cir. 2010) ("[S]trict scrutiny applies only to regulations that 'significantly interfere' with the right to marry.") (cleaned up); *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 613 (11th Cir. 1995) ("[R]easonable regulations that do not *significantly interfere* with decisions to enter into the marital relationship may legitimately be imposed.") (quoting *Zablocki,* 434 U.S. at 386); *Wolford v. Angelone*, 38 F. Supp. 2d 452, 459–60 (W.D. Va. 1999) ("The test which emerged from the [*Zablocki*] to determine whether the fundamental right to marry was implicated sufficiently to require strict scrutiny was whether the regulation(s) 'interfere directly and substantially with the right to marry.'") (quoting *Zablocki*, 434 U.S. at 386–87).

Direct and substantial interference with rights of marriage and intimate association occurs where the challenged government policy prevents all or a large portion of those subject to the policy from exercising these rights. *See Austin v. Berryman*, 862 F.2d 1050, 1055 (4th Cir. 1988), *aff'd on reh'g*, 878 F.2d 786 (4th Cir. 1989) (finding no direct or substantial interference with fundamental rights where the challenged statute "does not 'order or prevent' spouses or families from living together"); *Akers v. McGinnis*, 352 F.3d 1030, 1040 (6th Cir. 2003) ("[W]e will find 'direct and substantial burdens only where a large portion of those affected by the rule are absolutely or largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses.'") (citation omitted); *Stevens v. Holder*, 966 F. Supp. 2d 622, 639 n.13 (E.D. Va. 2013) ("Direct and substantial interference arises where a rule prevents all who wish to exercise a right from doing so.") (citing *Waters*, 57 F.3d at 426).

If the challenged government policy does not directly and substantially interfere with marriage and intimate association rights, it is subject to the deferential standard of rational basis review. *Baker v. McCall*, 842 F. Supp. 2d 938, 945 (W.D. Va. 2012); *see also Waters*, 57 F.3d 422, 426 (4th Cir. 1995) ("Because we conclude that the Policy does not significantly interfere with the fundamental right of marriage, we facially review the Policy to determine whether there was a rational basis for its passage."); *Akers*, 352 F.3d at 1040 ("We held that a 'direct and substantial interference' with intimate association was subject to strict scrutiny, while lesser interferences merely merited rational-basis review."); *Parks*, 43 F.3d at 614–15 ("Because the [defendant's] policy does not directly and substantially interfere with the fundamental right to marry, we subject the policy to rational basis scrutiny."). The policy "need only be rationally related to a legitimate government interest" to pass rational basis review. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 210 (4th Cir. 2019) (quoting *Star Sci. Inc. v. Beales*, 278 F.3d 339, 348 (4th Cir. 2002)); *see also Parks*, 43 F.3d at 614–15 (11th Cir. 1995) (statute subjected to rational basis review "will not violate the Due Process Clause if it is rationally related to a legitimate government interest").[11]

---

[11] Whether asserted as an associational right protected by the First Amendment or privacy right protected by the Due Process Clause, a claim that a government employer has unlawfully burdened an employee's right to marriage or intimate association is analyzed under the same standard. *See Parks*, 43 F.3d 609, 616 (11th Cir. 1995) ("Although the right to marry enjoys independent protection under both the First Amendment and the Due Process Clause, the Supreme Court has held that the same analysis applies in each context.") (citing *Lyng v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers*, 485 U.S. 360 (1988)); *Reynolds v. Summey*, No. 2:22-CV-02649-DCN-JDA, 2023 WL 3020196, at *8 n.11 (D.S.C. Mar. 30, 2023) ("Courts have held that a claim that government action burdens the right to [intimate association] is analyzed identically whether it has been cast as a due process right or an associational right.") (quoting *Colindres v. U.S. Dep't of State*, 575 F. Supp. 3d 121, 138–39 (D.D.C. 2021)); *Wolford*, 38 F. Supp. 2d at 463 ("[Plaintiff's] First Amendment challenge to [defendants'] anti-fraternization policy is subject to the same standard of review as her Fourteenth Amendment substantive due process claim.").

###### i.      *The policy did not directly or substantially interfere with Plaintiff's fundamental rights.*

Plaintiff has not alleged sufficient facts to establish that BPD's termination of her employment or BPD Policy 302 directly and substantially interfered with the exercise of her right to marry her spouse or her right to continued association with her spouse. This case is not the first in which a public employee has challenged a workplace restriction on personal associations, and courts in similar cases have reached the same conclusion.

In *Cross v. Baltimore City Police Dep't*, the plaintiff, a former BPD officer, challenged the constitutionality of the same rule challenged here, prohibiting BPD members from associating with persons of "questionable character." 73 A.3d 1186 (Md. Ct. Spec. App. 2013). The officer was terminated after pleading guilty to disciplinary charges based on her failure to inform her superior officers about her marriage to a convicted murderer and prison gang member. *Id.* at 1188. The officer appealed this decision in state court, arguing that the rule impermissibly restricted her federal constitutional right to marriage and intimate association. *Id.* The Maryland Court of Special Appeals (now Appellate Court of Maryland) determined that the rational basis test applied rather than strict scrutiny because the officer could not "persuasively argue that she was absolutely or largely prevented from forming an intimate association with [her spouse]." *Id.* at 1197.

Similarly, in *Parks v. City of Warner Robins, Ga.*, the Eleventh Circuit assessed a constitutional challenge to the City's anti-nepotism policy which prohibited relatives of supervisory employees, including spouses, from working in the same department. 43 F.3d at 611–12. When the plaintiff police sergeant was advised that her marriage to a police captain in the same department would violate the anti-nepotism policy, she postponed her wedding and filed suit under § 1983, arguing that the policy "infringed her First Amendment right of intimate association by conditioning her employment on the nonassertion of her right to marry . . . ." *Id.* at 612. The

Eleventh Circuit held that the policy "does not directly and substantially interfere with the right to marry" because it "does not create a direct legal obstacle that would prevent absolutely a class of people from marrying." *Id.* at 614. (citing *Califano v. Jobst*, 434 U.S. 47, 58 (1977)). Any "increased economic burdens" the policy may have placed "on certain city employees who wish to marry one another" did not effect a prohibition against marriage or "make marriage practically impossible for a particular class of persons." *Id.* Therefore, the policy did not amount to direct and substantial interference with the right to marry and was subject only to rational basis review, which the policy passed. *Id.* at 614–15.

In *Wolford v. Angelone*, the plaintiff alleged that "her forced resignation as a correctional officer . . . was procured by the enforcement of a [Department of Corrections ('DOC')] regulation that mandated discharge for employees married to inmates in the state prison system." 38 F. Supp. 2d at 454. The plaintiff sued DOC officials under § 1983 in the Western District of Virginia asserting that the regulation violated "her freedom of association under the First Amendment and her fundamental right to marry under the Fourteenth Amendment to the Constitution." *Id.* Citing *Parks* and the Seventh Circuit's decision in *Keeney v. Heath*, 57 F.3d 579 (7th Cir. 1995), the district court in *Wolford* concluded that the DOC defendants "[did] not directly and substantially interfere[] with the plaintiff's right to marry" and that the effect of the challenged regulation "on Wolford's right to marry was indirect and insubstantial." *Id.* at 461. The court noted that the regulation made no reference to marriage but only "'associations' which might compromise employee performance . . . ." *Id.* While recognizing that "the effect of the regulation in this case [was] to treat marriage as an impropriety, . . . that result [was] secondary to the primary goal of the anti-fraternization policy." *Id.* Moreover, the regulation "in no way hindered" the plaintiff's decision to marry her spouse. *Id.* "That [the plaintiff] lost her job as a result of her marriage to a

convicted felon in the state penal system, of course, requires some justification, but not at the highest level of constitutional scrutiny." *Id.* Accordingly, the court applied the rational basis test and concluded that the regulation passed muster. *Id.* at 462. *Cf. Keeney*, 57 F.3d at 580–81 (holding that jail regulation forbidding guards from "becom[ing] involved socially with inmates in or out of the [jail]" did not impose a "heavy" burden on the right to marry and that the regulation was justified by defendants' security interests).

In *Lewis v. Smith*, the plaintiff brought suit under § 1983 alleging, *inter alia*, that his termination from a law enforcement agency pursuant to the agency's anti-fraternization policy "infringed on his right to personal association and privacy in his intimate relationships . . . ." No. 19-30689, 2022 WL 10965839, at *1 (5th Cir. Oct. 19, 2022). The district court and, on appeal, the Fifth Circuit both agreed with the defendant that "the policy only incidentally affect[ed] the right to intimate association because it require[d] employees who violate[d] the policy to relinquish their jobs but d[id] not prohibit the relationship itself." *Id.* At *3. Therefore, "the deferential rational basis test" applied, which the anti-fraternization policy passed, and the Fifth Circuit affirmed dismissal of the intimate association claim. *Id.*

The rule in BPD Policy 302 challenged here is akin to the anti-fraternization policies challenged in *Lewis*, *Wolford*, and *Kenney*, and the anti-nepotism policy challenged in *Parks*. This Court is persuaded by the courts' reasoning in those cases. Plaintiff was married to her spouse before she even entered employment with BPD. (SAC ¶ 45.) Therefore, it cannot be said that BPD or Policy 302 prevented Plaintiff from marrying. There is no evidence or allegation that BPD ordered Plaintiff to end her marriage or stopped Plaintiff from visiting or otherwise associating with her spouse. Policy 302 states, "Members will refrain from making personal contacts with persons of questionable character, or visiting places where known violations of the law are

occurring, unless necessary to do so in the performance of their duty." (ECF 21-4 at 3.)[12] This policy does not target or even mention marriage, nor does it make it practically impossible for BPD employees to enter marriage or personal relationships. Although enforcement of the policy resulted in the termination of Plaintiff's employment, that result does not render the policy itself a prohibition against marriage. Plaintiff does not allege that Policy 302 prevents all or a substantial portion of BPD employees from exercising their rights to marry and maintain intimate associations. To the extent the policy interferes with the fundamental rights of marriage and intimate association, such interference is neither direct nor substantial. Accordingly, the policy is subject only to rational basis review in the face of Plaintiff's constitutional challenge.

### ii.    The policy is rationally related to legitimate governmental interests.

Rational basis review "imposes no affirmative evidentiary burden" on the governmental defendant; "rational speculation unsupported by evidence or empirical data" suffices. *Just Puppies, Inc. v. Frosh*, 457 F. Supp. 3d 497, 518 (D. Md. 2020) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), and *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018)). "Under this deferential standard, the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). Here, the Second Amended Complaint

---

[12] The Court may take judicial notice of Policy 302 as an authentic public record without converting Defendants' motion to dismiss to a motion for summary judgment. *Corbitt*, 2023 WL 3793997, at *3 ("On a motion to dismiss, a court may take judicial notice of matters of public record."); *see also Philips*, 572 F.3d at 180 ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."). Moreover, BPD Policy 302 is incorporated into the Second Amended Complaint by reference. *See Goines*, 822 F.3d at 165–66.

fails to negate every conceivable rational basis that might support the rule Plaintiff challenges in Policy 302, and a rational basis for the rule is apparent from the face of the policy.

Policy 302 states that it is BPD's policy "to establish rules and regulations for the good of the BPD, its members, and the community." (ECF 21-4 at 1.)[13] The policy further states that the rules and regulations outlined therein "are necessary for the achievement of BPD's goals[,]" including "a requirement that all members adopt a general standard of conduct both on and off-duty consistent with the professional standards of the law enforcement community." (*Id.*) Policy 302 points out that actions by each BPD member are "closely observed by the public[,]" whether the action "is part of one's official duty or private life . . . ." (*Id.*) The "fundamental aim" of the rules outlined in the policy "is to ensure optimum professionalism and safety . . . ." (*Id.*) Other goals include "[t]he development of a well-disciplined and efficient police department, which has the confidence and respect of the public . . . ." (*Id.*) Toward these goals, all BPD members are required to be "thoroughly familiar" with the rules and "to exercise good judgment and their common sense, which, together with the highest degree of cooperation by those entrusted with law enforcement, is essential to effective police work." (*Id.*) The rules of conduct outlined in Policy 302 indicate a purpose to promote "the good order, efficiency [and] discipline of the Department," and to avoid "[a]ny breach of the peace, neglect of duty, misconduct or any conduct or omission" by BPD members "which reflects discredit upon the Department or any member thereof, or which is prejudicial to the efficiency and discipline of the Department . . . ." (*Id.* at 2.) Among the rules of conduct is that which is specifically challenged in this action: that members "refrain from

---

[13] The Court may consider Policy 302 as a document incorporated into the Second Amended Complaint by reference and as an authentic public record without converting Defendants' motion to dismiss to a motion for summary judgment. *See* footnote 12 *supra*.

making personal contacts with persons of questionable character, . . . unless necessary to do so in the performance of their duty." (*Id.* at 3.)

Plaintiff fails to offer any facts to negate the proposition that BPD's legitimate interests are served by the prohibition against its members making personal contacts with persons of "questionable character." BPD has legitimate interests in safety, efficiency, and discipline in its operations, as well as maintaining the confidence and respect of the public. It is readily conceivable that contacts between BPD members and persons of questionable character may pose security risks and conflicts of interest. Members of the public may question the judgment and loyalty of BPD members involved in such contacts, which would erode public trust in BPD. It is reasonable for the rule to extend to the off-duty conduct of BPD members, particularly given the watchful eye and scrutiny of the public.

The court in *Cross* evaluated the same BPD policy being challenged in this case and came to the same conclusion, finding the rule to be "rationally related to the Department's goal of furthering public trust of the police in the community, maintaining discipline within the ranks of its force, and ensuring the safety of its employees." 73 A.3d at 1197. The court held that "the Department's interest is clearly legitimate, and the application of the General Order to the factors of this case is a rational means for advancing this interest." *Id.* at 1198 (citing *Akers*, 352 F.3d at 1039). Other courts have reached the same conclusion in similar cases. *See Ross v. Clayton Cnty., Ga.*, 173 F.3d 1305, 1311 (11th Cir. 1999) ("In the context of law enforcement, there is a special need to employ persons who act with good judgment and avoid potential conflicts of interest. Personal associations with felons or active probationers could undermine appropriate objectives of a law enforcement agency."); *Lewis*, 2022 WL 10965839, at *3 (holding that "a rational relationship exists between the [Sheriff's Office anti-fraternization policy] and a conceivable

legitimate objective") (citation omitted); *Ortiz v. Los Angeles Police Relief Ass'n*, 120 Cal. Rptr. 2d 670, 687 (Cal. Ct. App. 2002), *as modified* (June 19, 2002) (holding that "[plaintiff's] right to marry . . . was not violated because [police department]—in response to [plaintiff's] decision to marry an incarcerated felon—made a rational decision [to terminate plaintiff] to further legitimate interests: the personal safety and well-being of police officers and their families.").

The Second Amended Complaint fails to negate the rational basis for the rule challenged here. Accordingly, Plaintiff's claim that Policy 302 unconstitutionally interferes with her rights to marry and to intimate association will be dismissed.

### c.     Vagueness

Plaintiff also asserts a vagueness challenge to the enforcement of Policy 302 against her, stating that she was terminated under this policy for "making personal contacts with persons of questionable character" by "visiting her husband[,]" but that the policy "does not define the term 'questionable character.'" (SAC ¶¶ 75–78.)

A law or government policy "fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . ." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–403 (1966)). "A statute can be impermissibly vague for either of two independent reasons[:] [1] if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits[;] [2] if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Morales,* 527 U.S. at 56–57). The vagueness inquiry "is aided by both 'dictionary definitions and old-fashioned common sense.'" *Fusaro v. Howard*, 19 F.4th 357, 371 (4th Cir. 2021) (quoting *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012)).

"The degree of vagueness tolerated in a law depends in part on the type of statute." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). For instance, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982) (footnote omitted). In the context of public employment, workplace standards "are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (citing *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974)); s*ee also O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (adopting *San Filippo* standard). When a statute "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 499). But "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

A law "can be challenged as vague on its face or as applied to a particular party." *Stover v. Fingerhut Direct Mktg., Inc.*, 709 F. Supp. 2d 473, 480 (S.D. W.Va. 2009). "A plaintiff making an as-applied challenge must show that the statute in question provided insufficient notice that his or her behavior at issue was prohibited." *Dickerson v. Napolitano*, 604 F.3d 732, 745 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 490 (2d Cir. 2006)). This standard is objective. *Id.* (citing *Farrell*, 499 F.3d at 483). The question of vagueness as applied to a plaintiff does not turn on "whether the actual plaintiff knew that his or her conduct was prohibited[,]" *Farrell*, 449 F.3d at 483, or "whether [the] plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *Dickerson*, 604 F.3d at 746.

In a facial vagueness challenge, a party seeks invalidation of the enactment "to vindicate [the rights] of others who may also be adversely impacted by [it]." *Fusaro*, 19 F.4th at 374 (quoting *Morales*, 527 U.S. at 55–56 n.22); *see also Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) ("[A] successful facial attack means the statute is wholly invalid and cannot be applied *to anyone*."); *Jordan v. Pugh*, 425 F.3d 820, 829 (10th Cir. 2005) ("Facial vagueness and overbreadth challenges seek the same remedy—invalidation of the regulation."). Invalidating enactments as void for vagueness "is a disfavored judicial exercise." *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). "[F]acial challenges are disfavored[] because they rest on speculation, run counter to the principle of judicial restraint, and presume, contrary to the democratic process, that the state will not implement the law in a manner consistent with the Constitution." *Durstein v. Alexander*, 527 F. Supp. 3d 858, 865–66 (S.D. W.Va. 2021) (quoting *Guam Fed'n of Tchrs. v. Cruz*, Civ. No. 15-00003, 2016 WL 1383477, at *6 (D. Guam Apr. 7, 2016)); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51 (2008).

The Second Amended Complaint fails to state claim that Policy 302 is either facially vague or vague as applied to Plaintiff. The rule Plaintiff challenges prohibits BPD members "from making personal contacts with persons of questionable character, . . . unless necessary to do so in the performance of their duty." (ECF 21-4 at 3.) Plaintiff contends that the undefined term "questionable character" renders this rule impermissibly vague. (SAC ¶¶ 77, 78; ECF 41 at 7–8.) Merriam-Webster's Collegiate Dictionary defines "questionable," in part, as "liable to judicial inquiry or action" and "attended by well-grounded suspicions of being immoral, crude, false, or unsound . . . ." *Questionable*, Merriam-Webster's Collegiate Dictionary (11th ed.). Synonyms include "dubious" and "doubtful." *Id.* The New Oxford American Dictionary defines

"questionable," in part, as "not clearly honest, honorable, or wise[,]" providing as an example of usage, "a few men of allegedly questionable character." *Questionable*, New Oxford American Dictionary (3d ed.). Merriam-Webster's Collegiate Dictionary defines "character," in part, as "reputation" and "moral excellence and firmness[,]" with an example of usage, "a man of sound [character.]" *Character*, Merriam-Webster's Collegiate Dictionary (11th ed.). The New Oxford American Dictionary defines "character," in part, as "the mental and moral qualities distinctive to an individual" and "a person's good reputation . . . ." *Character*, New Oxford American Dictionary (3d ed.).

It is apparent from the foregoing definitions that "persons with questionable character," in the larger context of Policy 302, refers to persons whose reputations and/or moral qualities are unsound or in doubt, including to the point of being subject to "judicial inquiry or action." The Court recognizes that the concept of "questionable character" is imprecise and not perfectly clear, but, as previously noted, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Humanitarian Law Project*, 561 U.S. at 19.

Plaintiff's as-applied challenge to the rule fails because Plaintiff's spouse is a person of "questionable character," with whom the challenged rule clearly prohibits personal contacts by BPD members. Preliminarily, information incorporated into the Second Amended Complaint by reference and public records offered by Defendants establish that Plaintiff's spouse has been convicted of first-degree murder and is now serving a life sentence in prison. (*See* ECF 21-3 at 33; ECF 40-2; ECF 42-1.)[14] It is clear, therefore, that Plaintiff's spouse is a person whose reputation

---

[14] The Court may consider Policy 302 and the court records submitted by Defendants as public records without converting Defendants' motion to dismiss to a motion for summary judgment. *See* footnote 12 *supra*. Additionally, the Court may consider a personnel record submitted by Defendants identifying Plaintiff's spouse as the subject of the aforementioned court records. The identification of Plaintiff's spouse in her personnel file is incorporated into the Second Amended Complaint by reference. (*See* SAC ¶ 45; ECF 41 at 9 n.5.) Plaintiff raises no dispute as to the authenticity of any of these documents.

and moral qualities are in doubt and subject to judicial action such that he is a person of "questionable character" within the meaning of Policy 302. Plaintiff's subjective understanding of whether her contacts with her spouse violated Policy 302 are immaterial. *See Farrell*, 499 F.3d at 483 (vagueness inquiry as "objective, not subjective"); *Dickerson*, 604 F.3d at 745–46 ("The standard is an objective one. . . . Courts ask 'whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed,' . . . not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.") (citations omitted); *United States v. Kaluza*, Crim. No. 12-265, 2014 WL 295051, at *4 (E.D. La. Jan. 27, 2014) ("[T]he standard in vagueness challenges is an objective one . . . ."). Objectively, Policy 302 would put an ordinary person using ordinary common sense on notice that she would risk disciplinary action by making personal contacts with a person convicted of first-degree murder and serving a life sentence. *See San Filippo*, 961 F.2d at 1136; *Dickerson*, 604 F.3d at 745–46; *O'Laughlin*, 30 F.4th at 1055. Therefore, the Second Amended Complaint fails to state a claim that Policy 302 is vague as applied to Plaintiff as a BPD employee.[15]

Plaintiff's facial vagueness claim likewise fails. The U.S. Supreme Court has long held that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 18–19 (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 495); *see also Fusaro*, 19 F.4th at 374 ("Fusaro cannot complain of the Use Provision's facial vagueness because his conduct is 'clearly

---

[15] Plaintiff alleges in the Second Amended Complaint that Policy 302 "fails to give ordinary people fair notice of what is proscribed and is so standardless that it invites arbitrary enforcement[,]" and that BPD enforces the policy "enforces policy 302 in an arbitrary and capricious manner." (SAC ¶¶ 79, 80.) These conclusory allegations are inadequate to state a claim for relief without factual support. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted).

proscribed.'"). This rule applies even in cases that call for "a heightened vagueness standard[,]" such as cases implicating First Amendment freedoms. *Humanitarian Law Project*, 561 U.S. at 20 (citing *Parker v. Levy*, 417 U.S. 733, 755–757 (1974); *see also Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 41–42 (1st Cir. 2012) ("The principle extends to the First Amendment context . . . ."); *United States v. Di Pietro*, 615 F.3d 1369, 1372 (11th Cir. 2010) ("[T]he rule makes no exception for vagueness challenges that implicate the First Amendment."). Thus, "[a] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017) (quoting *Humanitarian Law Project,* 561 U.S. at 20). This principle has also been applied to cases implicating associational rights protected by the First Amendment. *See Di Pietro*, 615 F.3d at 1371 (rejecting facial vagueness challenge to statute implicating right to marry because the statute "clearly proscribes" conduct of criminal defendant, bringing her challenge "squarely within the rule prohibiting a facial vagueness challenge by one to whom a statute may be constitutionally applied"); *Lewis*, 2022 WL 10965839, at *4 ("Lewis's vagueness claim carries little weight because the policy clearly applies to his relationship with Doe.").

Viewing the facts in the light most favorably to Plaintiff, her personal contacts with her spouse were clearly proscribed by the rule in Policy 302 against personal contacts with persons of "questionable character." Therefore, Plaintiff cannot complain that the rule is facially vague or vague as applied to the conduct of others. Accordingly, Plaintiff's facial vagueness claim will be dismissed.

### d.    Overbreadth

Plaintiff's facial overbreadth challenge to Policy 302 also fails.[16]

---

[16] "[T]here is no such thing as an as-applied overbreadth challenge." *Does 1-5 v. Cooper*, 40 F. Supp. 3d 657, 677 (M.D.N.C. 2014) (citing *Farrell*, 449 F.3d at 498).

"[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Morales*, 527 U.S. at 52 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612–615 (1973)); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010). Under this doctrine, litigants are permitted "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. "Overbreadth attacks have also been allowed where the [Supreme] Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." *Id.* (citations omitted). Still, the overbreadth doctrine has been deemed "'strong medicine' that is used 'sparingly and only as a last resort.'" *N.Y. State Club Ass'n. Inc. v. New York*, 487 U.S. 1, 14 (1988) (quoting *Broadrick*, 413 U.S. at 613).

"[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). "Only a statute which is substantially overbroad may be invalidated on its face." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987) (citing *New York v. Ferber*, 458 U.S. 747, 769 (1982)). Indeed, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 441 (4th Cir. 2013) (quoting *Ferber*, 458 U.S. at 771). And "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent*, 466 U.S. at 801.

The Second Amended Complaint offers no facts to suggest that a substantial number of the applications of Policy 302 result in impermissible restrictions against speech or associations protected by the First Amendment. "Other than stating that the policy is overbroad and for that reason unconstitutional, [Plaintiff] has provided no meaningful analysis of this argument." *Lewis*, 2022 WL 10965839, at *3–4. Therefore, the Second Amended Complaint fails to state a plausible overbreadth challenge to BPD Policy 302, and Plaintiff's overbreadth claim will be dismissed.

### C.  Count III—Malicious Prosecution and Use of Process, and Abuse of Process

In Count III of the Second Amended Complaint, Plaintiff asserts claims against all Defendants for malicious prosecution, malicious use of process, and abuse of process under Maryland law.

Defendants first argue, and Plaintiff concedes, that Plaintiff fails to state a claim for malicious prosecution because none of the Defendants initiated a criminal proceeding against Plaintiff. (ECF 21-1 at 17–18; ECF 28 at 18.) Under Maryland law, "[a]ctions for malicious prosecution and malicious use of process have the same essential elements and are often referred to as being essentially synonymous, with most of the cases referring to malicious prosecution as arising out of a criminal proceeding and malicious use of process as arising out of a civil proceeding." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 694 A.2d 952, 955 (Md. 1997). Here, Plaintiff does not allege that any criminal proceeding was brought against her. Her claim for malicious prosecution will therefore be dismissed.

"The cause of action for malicious use of process has five elements and all must co-exist to maintain the action" under Maryland law: (1) the defendant instituted a prior civil proceeding; (2) the proceeding was "instituted without probable cause[,]" meaning without "a reasonable ground for belief in the existence of such state of facts as would warrant institution of the suit or proceeding complained of[;]" (3) the defendant instituted the proceeding "with malice"—that is,

"by an improper motive[;]" (4) the proceeding "terminated in favor of the plaintiff[;]" and (5) "damages were inflicted upon the plaintiff by arrest or imprisonment, by seizure of property, or other special injury which would not necessarily result in all suits prosecuted to recover for a like cause of action." *Id.* at 956 (citing *N. Point Const. Co. v. Sagner*, 44 A.2d 441, 445 (Md. 1945), and *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 205 n.7 (Md. 1985)). "To qualify as a 'special injury,' the damages must be different than those that ordinarily result from all suits for like causes of action." *Id.* at 959; *see also Keys*, 494 A.2d at 206–07 (citing *Owens v. Graetzel*, 132 A. 265 (Md. 1926)). "The mere expense and annoyance of defending a civil action is not a sufficient special damage or injury to sustain an action for malicious [use of process]." *One Thousand Fleet*, 694 A.2d at 956 (quoting *Sagner,* 44 A.2d at 445). In Maryland, malicious use of process claims "are viewed with disfavor in law and are to be carefully guarded against" because "[p]ublic policy requires that citizens be free to resort to the courts to resolve grievances without fear that their opponent will retaliate with a malicious use of process lawsuit against them." *Id.*, 694 A.2d at 955 (quoting *Sagner*, 44 A.2d at 444); *see also Wallace v. Mercantile Cnty. Bank*, 514 F. Supp. 2d 776, 789–90 (D. Md. 2007), *aff'd*, 307 F. App'x 720 (4th Cir. 2009).

Abuse of process is a Maryland cause of action that is distinct from malicious prosecution and malicious use of process. *One Thousand Fleet*, 694 A.2d at 956 (citing *Walker v. American Security Co.*, 205 A.2d 302, 306–07 (Md. 1964)). "[A]buse of process is concerned with the improper use of criminal or civil process in a manner not contemplated by law after it has been issued, without the necessity of showing lack of probable cause or termination of the proceeding in favor of the plaintiff . . . ." *Id.* (quoting *Walker*, 205 A.2d at 306–07).

> To sustain a cause of action for abuse of process, the plaintiff must prove: first, that the defendant wil[l]fully used process after it has issued in a manner not contemplated by law . . . ; second, that the

> defendant acted to satisfy an ulterior motive; and third, that damages
> resulted from the defendant's perverted use of process . . . .

*Id.* at 956 (citations omitted). "A bad motive alone is not sufficient to establish an abuse of process[;]" there must be "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process . . . ." *Id.* (citations omitted). Regarding damages, "[a] cause of action for civil abuse of process in Maryland requires that the plaintiff establish that an arrest of the person or a seizure of property of the plaintiff resulted from the abuse of process." *Id.* at 960 (citing *Bartlett v. Christhilf*, 14 A. 518, 522 (Md. 1888)).

Plaintiff's claims in Count III for malicious use of process and abuse of process are based on the allegedly "bogus" petition for a peace order Riggins-Green filed in the District Court of Maryland for Baltimore City in May 2019. Plaintiff alleges that Quick "directed" Riggins-Green "to file a bogus petition for peace order . . . falsely claiming that [Plaintiff] was a threat[,]" that Riggins-Green filed the false petition, and, "[u]pon information and belief," that Harrison and Guevara conspired with Quick and Riggins-Green to make this filing. (SAC ¶¶ 56–59.) According to Plaintiff, "BPD personnel" responded to the filing of the peace order petition by "spread[ing] false rumors" about Plaintiff, "circulating her photo to security personnel" throughout BPD and at City Hall—stating that Plaintiff "was banned from all City buildings"—issuing a notice to all BPD officers that Plaintiff "was a threat" to BPD, "sending sheriffs and detectives" to the homes of Plaintiff and her family members and tenants, and "making false and defamatory statements to family members and others asserting that a warrant had been issued for [Plaintiff's] arrest." (*Id.* ¶ 60.) The peace order proceedings terminated in Plaintiff's favor on May 31, 2019. (*Id.* ¶ 61.)

Defendants argue that Plaintiff fails to allege facts to support all elements of her claims for malicious use of process and abuse of process. (ECF 21-1 at 18–21; ECF 30 at 9–12.) Specifically, Defendants argue, Plaintiff fails to allege that the peace order petition was filed "with malice" or

an "ulterior motive" and "without probable cause," or that it caused Plaintiff any "special damages." (*Id.*) Plaintiff counters that the petition lacked reasonable grounds because it contained false statements, that malice may be inferred from the lack of probable cause, and that the peace order proceeding ended in Plaintiff's favor. (ECF 28 at 19–20.) She further argues the proceeding was initiated for the ulterior motive of unlawful retaliation. (*Id.* at 20–22.) As to her damages, Plaintiff cites her allegations regarding the actions of unspecified BPD personnel in response to the peace order petition. (*Id.* at 20, 23.)

The Court agrees with Defendants that the Second Amended Complaint fails to allege damages that are legally cognizable in a suit for malicious use of process and abuse of process under Maryland law. Plaintiff does not allege that she suffered any seizure of her person or property or "other special injury" that "would not necessarily result" from all peace order proceedings. *One Thousand Fleet*, 694 A.2d at 956. There are no allegations that Plaintiff was arrested or jailed in connection with the peace order matter or that any of her property was seized. Instead, Plaintiff alleges that she was harmed by the spreading of rumors, circulation of security notices about her within BPD, and visits law enforcement made to her home and the homes of family members and tenants.

Maryland law provides that, upon review of a petition for a peace order, a commissioner who finds "reasonable grounds" for the peace order "may issue an interim peace order to protect the petitioner or the petitioner's employee." Md. Code Ann., Cts. & Jud. Proc. § 3-1503.1(b). "An interim peace order . . . [m]ay order[,]" *inter alia*, "the respondent to: . . . [r]efrain from contacting, attempting to contact, or harassing the petitioner or the petitioner's employee;" and "[r]emain away from the place of employment . . . of the petitioner or the petitioner's employee." *Id.* § 3-1503.1(c)(2)(ii), (iv). Whenever an interim peace order issues, the commissioner is required

"[i]mmediately [to] forward a copy of the petition and interim peace order to the appropriate law enforcement agency for service on the respondent . . . ." *Id.* § 3-1503.1(e)(1). "Immediately on receipt of a petition and interim peace order," a law enforcement officer is required to "serve them on the respondent named in the order . . . ." *Id.* § 3-1503.1(f)(1).

In accordance with Maryland law, an interim peace order issued after Riggins-Green filed her petition against Plaintiff, and the interim order required Plaintiff to stay away from Riggins-Green's place of employment, BPD. (ECF 21-5 at 9.)[17] Upon receipt of this interim order, law enforcement was required to serve it on Plaintiff, which would have ordinarily involved visiting her home, the homes of family members, or other locations where Plaintiff could be found. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-1503.1(f)(1). Any efforts by law enforcement to serve the interim order and to enforce it through circulation of security notices within BPD—and any reputational harm to Plaintiff that may have resulted from these efforts—are ordinary effects of a peace order proceeding and, therefore, do not qualify as special injuries to Plaintiff. *See Sibley v. CarMax, Inc.*, 2020 WL 4050294, at *14 (Md. Ct. Spec. App. July 20, 2020) (affirming dismissal of complaint for malicious use of process where the challenged defamation suit was alleged to be "part of a pattern and practice of [d]efendants to legally harass, financially-exhaust, and defame [plaintiff]" because the alleged injuries were "the sort that ordinarily, if not always, result from a defamation suit[,]" and not "special" injuries); *Herring v. Citizens Bank & Tr. Co.*, 321 A.2d 182, 199 (Md. Ct. Spec. App. 1974) ("Any damage which [plaintiffs] may arguably have sustained to their credit ratings and business reputations by virtue of the filing of the confessed judgments was only that damage typically sustained by anyone placed in similar straits.").

---

[17] The Court may properly consider the copy of the petition and interim peace order filed at ECF 21-5 without converting the motion pursuant to Fed. R. Civ. P. 12(d), for reasons explained in footnote 12 *supra*.

Plaintiff's claims for malicious use of process and abuse of process must therefore be dismissed. *See One Thousand Fleet*, 694 A.2d at 959, 961 (affirming dismissal of claims for malicious use of process and abuse of process where plaintiff "failed to plead facts establishing legally cognizable damages"); *Manley v. Threeths*, Civ. No. ELH-20-2005, 2021 WL 2015457, at *7 (D. Md. May 20, 2021) (dismissing claims for malicious use of process and abuse of process because plaintiffs "have not claimed that the alleged wrongful proceedings resulted in an arrest, a seizure of property, or 'other special injury'").

Additionally, the Second Amended Complaint does not include adequate factual allegations to suggest that the peace order proceeding was instituted with malice and without probable cause. Under Maryland law, a petitioner may seek entry of a peace order against a respondent within 30 days of the respondent committing against the petitioner "[a]n act that places the petitioner or the petitioner's employee in fear of imminent serious bodily harm . . . ." Md. Code Ann., Cts. & Jud. Proc. § 3-1503(a)(1)(ii). The peace order petition filed by Riggins-Green on May 3, 2019, includes allegations that Plaintiff sent her "a threatening text message" on May 1, 2019, and that Plaintiff was "angry" with Riggins-Green for reporting her to IA. (ECF 21-5 at 3–4.) Riggins-Green stated that, after she reported Plaintiff to IA, Plaintiff was investigated for continuing contacts she had with her spouse, who was serving a life sentence in prison, and then terminated from BPD based on findings from the IA investigation. (*Id.* at 4–5.) According to Riggins-Green, Plaintiff subsequently sent her a text message containing expletives and statements Riggins-Green deemed threatening.[18] (*Id.* at 3.) In the Second Amended Complaint, Plaintiff

---

[18] Riggins-Green included the contents of the text message in the petition, which states the following, in part:

alleges that Riggins-Green's account in the peace order petition was "bogus" and "riddled with lies and half-truths[,]" (SAC ¶¶ 57, 59), but fails to identify what false statements she contends Riggins-Green made in the petition. Without explanation of what falsehoods were contained in the petition, the Second Amended Complaint fails to plead that the petition was filed with malice or that it lacked probable cause—that is, "a reasonable ground for belief in the existence of such state of facts as would" place Riggins-Green "in fear of imminent serious bodily harm" and thereby "warrant institution of" the peace order proceeding. *One Thousand Fleet*, 694 A.2d at 956; Md. Code Ann., Cts. & Jud. Proc. § 3-1503(a)(1)(ii). For these additional reasons, Plaintiff's claim for malicious use of process in Count III of the Second Amended Complaint will be dismissed.

The allegations in the Second Amended Complaint are also insufficient to support a reasonable inference that any of the Defendants willfully used "in a manner not contemplated by law" any process that issued in connection with the peace order proceeding. *One Thousand Fleet*, 694 A.2d at 956 (citing *Keys*, 494 A.2d at 207). As explained above, Maryland law contemplates— and, in fact, requires—immediate service of any petition for a peace order and interim peace order on the respondent named on the order. Md. Code Ann., Cts. & Jud. Proc. § 3-1503.1(f)(1). Plaintiff's allegation that she, the respondent named in the interim order, and her family members were visited by law enforcement following Riggins-Green's filing of the peace order petition is inadequate to suggest that these visits were improper. It is to be expected that law enforcement officers attempting to effect service will visit the home of the person they are trying to serve and

---

Remember—nothing matters unless someone fucks with your money then all is fair game. And remember for those who state they heed spiritual practices HEED your words/faith or your energy will come back and FUCK you 5 times over. Never question other motives. . . . [T]hose true to themselves never have to do anything—not lie, not steal, not cheat because as soon as they do that it sets their FATE in motion. So beware!

(ECF 21-5 at 3.)

other locations where she may be found. Such efforts by law enforcement are not only lawful but legally required. *See id.* The abuse of process claim in Count III of the Second Amended Complaint is subject to dismissal for this additional reason.

### D.  Count VI—Violations of 42 U.S.C. § 1985

In Count VI of the Second Amended Complaint,[19] Plaintiff asserts a claim under 42 U.S.C. § 1985 against Quick and Riggins-Green for conspiracy to violate federal rights based upon race discrimination. Section 1985 provides "a private cause of action for certain conspiracies to violate constitutional rights." *Lewis-Davis v. Bd. of Educ. of Baltimore Cnty.*, Civ. No. ELH-20-0423, 2021 WL 4772918, at *21 (D. Md. Oct. 13, 2021); *see generally* 42 U.S.C. § 1985. The Second Amended Complaint does not specify which provision in § 1985 Plaintiff relies upon in Count VI. Plaintiff's conspiracy claim appears to arise solely from § 1985(3), which "imposes liability on two or more persons who 'conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws.'" *Ziglar v. Abbasi*, 582 U.S. 120, 150 (2017) (quoting 42 U.S.C. § 1985(3)).

> An action under section 1985(3) consists of these essential elements: (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985); *see also Kobe v. Buscemi*, 821 F. App'x 180, 187 (4th Cir. 2020) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)).

Defendants argue that "Plaintiff's § 1985 claim is barred by the intracorporate conspiracy doctrine . . . ." (ECF 21-1 at 21, ECF 30 at 13.) Under the intracorporate conspiracy doctrine, "an

---

[19] Count VI appears to be incorrectly numbered. The Second Amended Complaint does not include any count numbered V.

agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar*, 582 U.S. at 153 (2017). Although the doctrine originated in the antitrust context, the Fourth Circuit and other federal Courts of Appeals have applied it to civil rights conspiracies. *See, e.g.*, *Buschi*, 775 F.2d at 1251–52; *Bowie v. Maddox*, 642 F.3d 1122, 1130 (D.C. Cir. 2011) (citing cases). "There are, however, two important exceptions to the doctrine." *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353 (4th Cir. 2013). The doctrine does not apply (1) "where a co-conspirator possesses a personal stake independent of his relationship to the corporation" or (2) "where the agent's acts were not authorized by the corporation." *Id.* (citing *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002), and *Buschi*, 775 F.2d at 1252–53).

Plaintiff alleges in the Second Amended Complaint that Quick and Riggins-Green, both employees of BPD, met in early 2019 to discuss Plaintiff, and Plaintiff was later informed that Riggins-Green accessed her personnel file. (SAC ¶¶ 41–44.) In March 2019, Riggins-Green initiated an IA complaint against Plaintiff, and Plaintiff was placed under an IA investigation that ultimately resulted in the termination of her employment with BPD. (*Id.* ¶¶ 46–51.) The Second Amended Complaint does not contain any allegations that Quick and Riggins-Green shared a discriminatory or retaliatory animus toward Plaintiff, that they were motivated by a personal stake independent of their relationship with BPD, or that they took action that was not authorized by BPD. Plaintiff's allegation that Quick bore a discriminatory bias or animus toward Plaintiff is insufficient to support any inference that Riggins-Green shared such a bias or animus or that either Quick or Riggins-Green was motivated by a personal stake independent of their work for BPD. *See Painter's Mill Grille*, 716 F.3d at 353 (rejecting argument that an individual defendant's "personal racial animus" constitutes an "independent personal stake" sufficient to overcome the

intracorporate conspiracy doctrine in § 1985(3) case "because every claim under that statute depends on a showing that the conspirators shared an invidiously discriminatory motivation") (quoting *Hartman v. Bd. of Trustees of Community Coll. Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993)).

For the foregoing reasons, the intracorporate conspiracy doctrine applies to the instant case and bars Plaintiff's § 1985(3) civil rights conspiracy claim as alleged in the Second Amended Complaint. *See id.* (affirming dismissal of § 1985(3) claim against "agents of the same two companies" for failure to plead facts supporting an exception to intracorporate conspiracy doctrine); *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 542 (D. Md. 2014) (applying intracorporate conspiracy doctrine and dismissing § 1985 claim that defendants conspired to terminate plaintiff's employment where plaintiff and defendants were employees of same corporation and plaintiff did not allege that defendants "possessed a personal stake independent of their relationship to their employer or . . . were acting outside the scope of their employment") (quoting *ePlus Tech.,* 313 F.3d at 179) (cleaned up); *Burgess v. Baltimore Police Dep't*, Civ. No. RDB-15-0834, 2016 WL 795975, at *11 (D. Md. Mar. 1, 2016) (applying intracorporate conspiracy doctrine and dismissing § 1985 claim against BPD officers).[20] Count VI will be dismissed.

---

[20] Plaintiff's naming of Quick and Riggins-Green as defendants in both their official and individual capacities does not preclude application of the intracorporate conspiracy doctrine in this case. The Second Amended Complaint contains no allegation that either defendant took any action in connection with any conspiracy that was outside the scope of their official duties. *See Buschi*, 775 F.2d at 1252 ("[T]he immunity granted under the doctrine to the agents and the corporation [is not] destroyed because the agents are sued individually . . . . 'Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege that they acted other than in the normal course of their corporate duties.'") (citation omitted).

**IV.      CONCLUSION**

For the reasons stated herein, Defendants' Motion will be GRANTED. The Second Amended Complaint will be dismissed without prejudice to an amended pleading consistent with this Memorandum Opinion.

A separate Order will issue.


December 12, 2023 _____/S/_____
                  Matthew J. Maddox
                  United States District Judge